714 F.2d 1316
 36 UCC Rep.Serv. 1473
 In re Cynthia K. McBEE, d/b/a Oak Hill Gun Shop, Debtor.
NATIONAL BANK OF TEXAS, Appellant,
v.
WEST TEXAS WHOLESALE SUPPLY COMPANY, Appellee,
v.
REPUBLICBANK-AUSTIN, Appellee-Appellant.
 No. 82-1287.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 22, 1983.
 
 B. Weldon Ponder, Jr., Austin, Tex., for Nat. Bank of Texas.
 Don L. Baker, Austin, Tex., for West Texas.
 William H. Daniel, Austin, Tex., for RepublicBank-Austin.
 Appeals from the United States Bankruptcy Court for the Western District of Texas.
 Before THORNBERRY, GEE and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge.
 
 
 1
 This case concerns the determination of the rights of three secured creditors: National Bank of Texas ("National Bank"),[1] West Texas Wholesale Supply Company ("Wholesale Supply"), and RepublicBank-Austin ("RepublicBank").[2] It raises novel questions of perfection and priorities in an unusual factual setting, including a bulk sale which did not comply with Article 6 of the Uniform Commercial Code and the subsequent bankruptcy of the transferee of the assets in question.
 
 I. FACTS
 
 2
 From January, 1979, until May 5, 1980, Joe Ben Colley, who is not a party to these proceedings, owned and operated a business known as the Oak Hill Gun Shop. In January 1979, Cynthia K. McBee approached National Bank for a loan and represented to it that she was Colley's partner in the Oak Hill Gun Shop. As found by the bankruptcy court for the Western District of Texas, 20 B.R. 361,[3] no partnership in fact existed; McBee lent her "creditworthiness" in assisting Colley to obtain a loan for his sole proprietorship. A loan was extended to "Oak Hill Gun Shop" as debtor, but signed by McBee as "partner". National Bank filed a U.C.C.-1 financing statement with the Secretary of State of the State of Texas solely under the name Oak Hill Gun Shop. The financing statement purported to collateralize all present and after acquired inventory of the gun shop.
 
 
 3
 Subsequently, Wholesale Supply, an inventory supplier, extended goods on credit and filed the financing statement on April 22, 1980, specifying "Joe B. Colley d/b/a Oak Hill Gun Shop" as debtor. The U.C.C.-1, signed by Colley, covered all inventory, proceeds and accounts receivable and also all equipment, furniture and fixtures used in the debtor's place of business.
 
 
 4
 On May 5, 1980, Colley assigned his interest in the Oak Hill Gun Shop to Cynthia K. McBee. The assignment included any "partnership interest" Colley had in the gun shop. The assignment agreement provided that McBee in the transfer of the business would comply with the provisions of Article 6 of the Texas Uniform Commercial Code dealing with bulk transfers. McBee never in fact complied with these provisions, including Section 6.105 which requires notification of the bulk transfer to the transferor's creditors. Tex.Bus. & Comm.Code Ann. § 6.105 (Vernon 1968).
 
 
 5
 Thereafter, McBee sought and obtained a loan from RepublicBank. RepublicBank filed a U.C.C.-1 financing statement on July 16, 1980, naming "C.K. McBee dba Oak Hill Gun Shop" as debtor. The statement filed by RepublicBank covered "All accounts, contract rights ... inventory ... whether now owned or hereafter acquired."
 
 II. PROCEEDINGS BELOW
 
 6
 McBee filed a petition in bankruptcy on October 22, 1980. On January 31, 1981, the trustee in bankruptcy conducted an auction sale of all the remaining inventory of the Oak Hill Gun Shop. Subsequently, on February 19, National Bank filed its Motion for Distribution of Cash Collateral, by which it asked the bankruptcy court to distribute some $40,000 in proceeds from the auction sale, with payment being made first to National Bank in full discharge of its claim, and the balance, if any, being paid to Wholesale Supply and RepublicBank in the order of their priority.
 
 
 7
 On April 8, 1981, National Bank filed its Motion to Establish Bar Date by which it asked the bankruptcy court to establish a deadline for the filing of objections to National Bank's Motion for Distribution of Cash Collateral. Thereafter, the bankruptcy court established April 30 as the bar date. RepublicBank did not file a timely objection to National Bank's motion for distribution of cash collateral before the bar date deadline; it did, however, timely object to Wholesale Supplies' similar Motion for Payment of Sum on April 20.
 
 
 8
 At the beginning of the May 7 hearing on National Bank's motion, RepublicBank sought leave to file an objection. In support of its effort to file an objection after the bar date, RepublicBank claimed that newly discovered evidence provided it grounds for the first time to object to National Bank's claimed priority. After argument by all counsel, the bankruptcy court granted RepublicBank's motion for leave to file objection. The bankruptcy court then proceeded to trial and, after the presentation of evidence and the submission of briefs by all parties, entered its opinion and order here on appeal.
 
 
 9
 The bankruptcy court held that under the Uniform Commercial Code, as adopted by Texas,[4] Wholesale Supply had first priority in the fund created by the trustee in bankruptcy's sale of the gun shop inventory followed by RepublicBank's right to satisfy its claim with the remainder. In so concluding, the court held that National Bank's claim to first priority was without merit inasmuch as it had failed to perfect its security interest. Both National Bank and RepublicBank appeal the bankruptcy court's determination, asserting their respective claims to priority in the proceeds of the sale of the bankrupt's assets.[5]
 
 
 10
 We disagree with the court's conclusion that National Bank failed to perfect its security interest, under Section 9.402(g) of the Texas Uniform Commercial Code. Tex.Bus. & Comm.Code Ann. § 9.402(g) (Vernon 1968 & Supp.1982-1983). Thus, priority among all three perfected creditors must be determined. After considering the specific provisions of Article 6, we find that by virtue of the non-complying bulk transfer of the gun shop, transferor Colley's creditors--National Bank and Wholesale Supply--retained their security interest in the inventory of the gun shop to the extent of the value of the inventory existing at the time of the bulk sale. We find nothing in the Code which would limit this interest to the specific inventory transferred at the earlier time but still traceable as remaining at the time of bankruptcy, as argued by RepublicBank. Thus, in accordance with the following discussion, we find that National Bank is to be granted first priority to the extent of the value of the collateral transferred, with priority in the remainder to Wholesale Supply. RepublicBank's priority is limited to the excess value, if any, of the sale proceeds over the value of the inventory which existed when the business was transferred and which was transferred in bulk.
 
 III. DISCUSSION
 A. Bar Date
 
 11
 National Bank contends that the bankruptcy court abused its discretion in entertaining RepublicBank's objections after the established bar date. In support of this position, National Bank argues that RepublicBank's claim of "newly discovered evidence" was not supported by any evidence and that the untimely nature of the objection resulted in unfair surprise and prejudice to National Bank. We find that this threshold argument lacks merit.
 
 
 12
 In the court below, RepublicBank claimed that certain facts relevant to the issue of ownership of the gunshop did not come to its attention until after the bar date had passed. The question of whether Oak Hill Gun Shop was a sole proprietorship or a partnership prior to its sale to McBee by Colley affects National Bank's claim of priority. The bankruptcy court was presented with conflicting evidence as to when RepublicBank learned, or reasonably should have learned, the facts giving rise to the ownership issue. Given our reading of the record below, we find support for concluding that RepublicBank was unaware before the bar date of facts which might provide it a basis for an objection.
 
 
 13
 We also are unable to discern any valid grounds for National Bank's claim of unfair surprise. National Bank does not contend that it was unaware of the facts giving rise to the substance of RepublicBank's objection. Rather, it contends that the "last minute objection" prejudiced its ability to present its case fully and capably. National Bank urges it was prevented from preparing additional witnesses and documents and from engaging in additional investigation and discovery. National Bank does not provide any additional, specific indication of the evidence which it would have been able to present upon further investigation. Our review of the record reveals that National Bank called several witnesses and introduced a number of exhibits pertinent to the issue of the gun shop's ownership. If National Bank had in fact believed itself unprepared to go on with the May 7 hearing when RepublicBank "surprised" it with an objection, National Bank should have moved for a continuance. But it did not do so. National Bank's claim of unfair surprise because it was unprepared to proceed, if valid, could easily have been cured by a motion for continuance below. We find it not justified to disturb the bankruptcy court's order on the basis of this objection.
 
 
 14
 We conclude, therefore, that the bankruptcy court did not abuse its discretion in allowing RepublicBank to file its objection after the bar date. The court's factual determination that "newly discovered evidence" had been revealed to RepublicBank after the bar date had passed was not clearly erroneous. Similarly, we find no error in the court's conclusion that this evidence justified allowance of RepublicBank's untimely objection. Finally, we conclude that National Bank's claim of unfair surprise, even if valid, cannot be considered here as National Bank should have, but did not, seek a continuance below. See Fed.R. Bankruptcy 924 and Fed.R.Civ.P. 60 (new evidence as ground for relief from final judgment); Fed.R.Civ. 15(a) (leave to amend "shall be freely given when justice so requires").
 
 B. Security Interests
 
 15
 The Bankruptcy Court found that the U.C.C.-1 financing statement filed by National Bank was insufficient to perfect its security interest because it was filed under the trade name "Oak Hill Gun Shop" rather than in the individual name of the debtor. Section 9.402 of the Texas Uniform Commercial Code sets out the requirements of a financing statement which must be met in order to perfect a security interest. Tex.Bus. & Comm.Code Ann. § 9.402 (Vernon Supp.1982-1983). At issue here is § 9.402(g) which provides that the "financing statement sufficiently shows the name of the debtor if it gives the individual, partnership, or other corporate name of the debtor, whether or not it adds other trade names or the names of the partners."
 
 1. Perfection: National Bank
 
 16
 In assessing whether a security interest may validly attach to assets of the estate in bankruptcy, the trustee is considered to be a hypothetical lien creditor. Unless a creditor's interest is perfected, as against the trustee in this hypothetical position, its asserted interest in collateral is not effective.
 
 
 17
 In the immediate, and usual case, "perfection" of a security interest is sought by filing a "U.C.C.-1" financing statement. For perfection to be achieved, the filing must comply with the requirements of the Uniform Commercial Code, as adopted in Texas. Tex.Bus. & Comm.Code Ann. § 9.402 (Vernon Supp.1982-1983). The framers of the Code envisioned a simplified "notice" filing system to avoid the rigid technicalities which might otherwise pose unnecessary pitfalls in the path to perfection. As we have previously stated, in analyzing the Code as similarly adopted in another jurisdiction:
 
 
 18
 The purpose of the filing system is to give notice to creditors and other interested parties that a security interest exists in property of the debtor. Owen v. McKesson & Robbins Drug Co., 349 F.Supp. 1327, 1334 (N.D.Fla.1972). Perfect accuracy, however, is not required as long as the financing statement contains sufficient information to "put any searcher on inquiry." In re Excel Stores, Inc., 341 F.2d 961, 963 (2d Cir.1965). See also In re Fowler, 407 F.Supp. 799, 802 (W.D.Okla.1975). The emphasis of the Uniform Commercial Code is thus on commercial realities rather than on corporate technicalities. Siljeg v. National Bank of Commerce, 509 F.2d 1009, 1012 (9th Cir.1975). Section 9-402(5) reflects this emphasis by providing: "A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." Fla.Stat.Ann. § 679.9-402(5) (1966). See generally In re Hammons, 614 F.2d 399, 405-406 (5th Cir.1980).
 
 
 19
 In re Glasco, Inc., 642 F.2d 793, 795 (5th Cir.1981). Therefore, the critical inquiry in assessing whether a security interest is perfected is whether a reasonably prudent subsequent creditor would have discovered the prior security interest.
 
 
 20
 The bankruptcy court held that National Bank's filing in the name of "Oak Hill Gun Shop" was insufficient to perfect its security interest, reasoning that use of a "trade" name was "seriously misleading" under Section 9.402(g) of the Code. The court concluded that since the shop was a sole proprietorship, the Code required filing in the individual, rather than in the business, name. We recognize that in most cases of individual ownership, filing under a trade name will be seriously misleading and thus insufficient to perfect a security interest. Similarly, we agree that the Code recognizes this norm in Section 9.402(g). We disagree, however, with the court's presumption that this general rule is absolute and is to be applied rigidly without reference to the Code's overriding goal of sufficient "notice." Rather, in some cases filing under a trade name would not be seriously misleading and would provide creditors with equal, if not superior, notice of prior security interests. The immediate case, we find, constitutes such an exception to the rule. National Bank's filing under "Oak Hill Gun Shop" to secure business collateral should reasonably have been discovered by a subsequent creditor securing the same collateral, held in the same business name. In accordance with the analysis which follows then, we find that National Bank held a perfected security interest.
 
 
 21
 Section 9.402(g) provides that "[a] financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners." Thus, where the debtor is an individual or partnership, the Code provides that it is "sufficient" to file under the respective individual or partnership name, and omit the assumed (d/b/a) name under which the business entity may be known. The Code, however, does not address the converse proposition of whether filing under the assumed name is sufficient. "The section says only that filings in the actual individual or partnership name are sufficient, not that such filings are 'necessary and sufficient.' " J. White & R. Summers, Uniform Commercial Code 959 (2d ed. 1980). It is this converse proposition, neither addressed directly in the Code nor resolved by the Texas courts, that is here at issue. Specifically, was National Bank's filing in the assumed name "Oak Hill Gun Shop" sufficient?
 
 
 22
 We must first dispose of the possibility of Colley and McBee having been in partnership, or having created a partnership by estoppel. Further, if a partnership by estoppel had been created, of what significance would it be in this case?
 
 
 23
 If Oak Hill Gun Shop were a partnership, filing under its business name alone would have been "sufficient" under § 9.402(g). As found by the bankruptcy court, however, the gun shop was not a partnership. Rather, it was a sole proprietorship owned by Colley until its sale on May 5, 1980, to McBee. National Bank does not dispute this finding on appeal in spite of McBee calling herself a partner in the loan application and both parties later referring to a partnership when Colley sold the business to McBee.
 
 
 24
 National Bank does, however, contend that the bankruptcy court erred in concluding that the gun shop was not a "partnership by estoppel," citing Tex.Rev.Civ.Stat. Ann. art. 6132b § 16 (Vernon 1968). This provision, adopted from the Uniform Partnership Act, states in relevant part:
 
 
 25
 Sec. 16. (1) When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made:
 
 
 26
 (a) When a partnership liability results, he is liable as though he were an actual member of the partnership;
 
 
 27
 (b) When no partnership liability results, he is liable jointly with the other persons, if any, so consenting to the contract or representation as to incur liability, otherwise separately.
 
 
 28
 (2) When a person has been thus represented to be a partner in an existing partnership, or with one or more persons not actual partners, he is an agent of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, with respect to persons who rely upon the representation. Where all the members of the existing partnership consent to the representation, a partnership act or obligation results; but in all other cases it is the joint act or obligation of the person acting and the persons consenting to the representation.
 
 
 29
 The bankruptcy court considered this section and concluded that the evidenced conduct and representations did not establish a partnership by estoppel, so the U.C.C.-1 had to comply with the individual owner name requirement. We reach the same result, but on the basis that whether or not there was a partnership by estoppel is irrelevant in resolving this dispute.
 
 
 30
 The estoppel provision is limited in scope, equitably imposing liability for misrepresentations of partnership upon those who hold themselves out as partners. The provision, as set out above, is carefully and unambiguously directed at defining the liabilities of the "partners" alone. This narrow coverage estops individuals from denying their purported relationship to those relying upon the misrepresentations. It does not create partners of those who misrepresent partnership to third persons who were not parties to the representation of partnership.
 
 
 31
 In the immediate case, even assuming that McBee and Colley's actions amounted to a partnership by estoppel, the "holding out" was directed towards National Bank. The trustee in bankruptcy, as a hypothetical lien creditor, would certainly not be affected by the operation of § 16 in creating a partnership by estoppel. That section would make Colley and McBee liable to National Bank, but does not affect the rights and liabilities of National vis-a-vis the trustee as a hypothetical creditor, not a party to the misrepresentation. The statute therefore does provide National Bank with recourse towards the offending parties alone, McBee and Colley, and does not reach out to bind the trustee, as an unknowing third party, to representations to which he was not privy. See also Tex.Rev.Civ.Stat.Ann. art. 6132b § 7(1) (Vernon 1968) ("Except as provided by Section 16 persons who are not partners as to each other are not partners as to third persons"). Accordingly, since the statute does not reach the situation at issue, we find that the Oak Hill Gun Shop must be considered as a sole proprietorship. In so concluding, we do not pass upon the court's factual determination that no partnership by estoppel was shown inasmuch as it was not necessary for the court to reach that issue.
 
 
 32
 Having ruled out the justification of the listing of the "Oak Hill Gun Shop" as adequate because of partnership, we now evaluate the adequacy of the filing when the debtor was an individual vis-a-vis the bankruptcy trustee. The Official Comment to Section 9.402(g) provides:
 
 
 33
 In the case of individuals, [this section] contemplates filing only in the individual name, not in a trade name. In the case of partnerships it contemplates filing in the partnership name, not in the names of any of the partners, and not in any other trade names. Trade names are deemed to be too uncertain and too likely not to be known to the secured party or person searching the record, to form the basis for a filing system.
 
 
 34
 Tex.Bus. & Comm.Code § 9.402(g) official comment 7 (Vernon Supp.1982-1983). Clearly, this comment enunciates the general rule that in the case of an individual proprietorship, filing under a trade name is insufficient. This principle, however, cannot be applied blindly without reference to the overriding purpose it seeks to serve. Specifically, the Code's drafters voiced concern that trade names would be "too uncertain and too likely not to be known to the secured party or person searching the record." This concern merely echoes the overriding Code theme of "notice" filing. The comment to the Code reflects a belief that, as a general matter, notice cannot sufficiently be assured through filing under trade names where an individual is the debtor. Yet, as the facts of the immediate case demonstrate, situations may arise in which equal, if not superior, notice may be achieved through filing in the trade, rather than individual, name.
 
 
 35
 National Bank could, potentially, have filed under three names: Joe Ben Colley, Cynthia McBee, or Oak Hill Gun Shop. Assume first that it had filed under the actual owner's name, Joe Ben Colley. The Code, as conceded by RepublicBank, states that this filing would have been "sufficient." Yet prior security interests filed under "Colley" would have provided little possibility of notice to one of McBee's creditors.
 
 
 36
 Consider, then, a filing under the name of McBee. This filing would have provided notice to McBee's future creditors. It would not, however, accurately have reflected the true ownership of the gun shop collateral. Although, fortuitously, an intervening sale would have "corrected" the inaccurate designation of ownership, the Code does not sanction a filing system premised on false representations of ownership.
 
 
 37
 Finally, we turn to the notice provided by the actual filing made, "Oak Hill Gun Shop." This name was consistently, and exclusively, used to reference the business first owned by Colley and subsequently by McBee. Any creditor, seeking to ascertain prior encumbrances on the business collateral here at issue, could assuredly discover pre-existing security interests by virtue of a filing in the name of the gun shop. RepublicBank could have done so if it had looked. This is not the case of a personal loan; there a creditor might not reasonably be expected to know or search under a business name. Here, a reasonably prudent creditor--as we assume for purposes of the law is the trustee--certainly should have searched under the name "Oak Hill Gun Shop" before extending a loan related to that business and collateralized by property of that business.[6] Further compelling this conclusion is the fact that McBee had only recently acquired the gun shop, a fact that any reasonably prudent creditor should have uncovered. With this knowledge, a creditor should have considered the possibility, if not probability, that prior security interests would be filed in names other than McBee's. Cf. Tex.Bus. & Comm.Code § 9.402(g) official comment 8 ("any person searching the condition of ownership of a debtor must make inquiry as to the debtor's source of title, and must search in the name of a former owner if circumstances seem to require it"). The agreement evidencing McBee's source of title, regardless of its veracity,[7] provided that Colley sold to McBee "all ... title, and interest in and to any partnership interest" in the gun shop. Any creditor, reasonably discovering this purported prior partnership interest should have searched under the gun shop's name.[8]
 
 
 38
 The U.C.C. seeks to maximize the probability of notice and, simultaneously, to minimize the possibility that a security interest will be defeated by formal and rigid technicalities. Together with a number of other courts this Court has considered these overriding goals and rejected any automatic rule that perfection is defeated by a filing in an inaccurate name. See, e.g., In re Glasco, 642 F.2d 793 (5th Cir.1981) (filing under trade name, "Elite Boats, Division of Glasco, Inc." rather than legal name "Glasco, Inc." effective if not seriously misleading); Siljeg v. National Bank of Commerce, 509 F.2d 1009 (9th Cir.1975) (question was not whether "true name" of corporation was "Empire" or "Henry House Packing Co., Inc." but whether filing was seriously misleading to other creditors). Other courts have favored a more automatic rule, that trade names are inherently misleading. See, e.g., In re Leichter, 471 F.2d 785 (2d Cir.1972); In re Thomas, 466 F.2d 51 (9th Cir.1972). We find the former, flexible approach the proper one under the U.C.C. See Tex.Bus. & Comm.Code § 9.402(h) & official comment 9 (errors which are "not seriously misleading" do not make financing statement ineffective; this provision was "designed to discourage the fanatical and impossibly refined reading of such statutory requirements in which courts have occasionally indulged themselves"). See also J. White & R. Summers, Uniform Commercial Code 957-58 (2d ed. 1980) (proper approach is to focus on "whether a reasonably diligent searcher would likely discover a financing statement indexed under the incorrect name").
 
 
 39
 In the immediate case it is clear that a filing under the name "Oak Hill Gun Shop" was not seriously misleading. As concluded above, any reasonably diligent searcher would probably have been more likely to discover this filing than one in either individual's name. It is undisputed that the trade name was consistently used and well known to all creditors, unlike the individual names, and the loans were extended for business rather than personal needs and explicitly collateralized "Oak Hill Gun Shop" property. The sale of the gun shop as evidenced by an agreement referencing a partnership particularly raised the possibility, if not probability, of alternative filings. In light of these particular facts, we find that National Bank's filing was not "seriously misleading," Citizens Bank v. Ansley, 467 F.Supp. 51, 55 (M.D.Ga.), aff'd without opinion, 604 F.2d 669 (5th Cir.1979); and hence was effective against the trustee in bankruptcy.
 
 2. Priorities
 
 40
 The general rule, of course, is that priorities of perfected security claims are determined in the order of filing. See Tex.Bus. & Comm.Code Ann. § 9.312(e) (Vernon 1968 & Supp.1982-1983). See generally J. White & R. Summers, Uniform Commercial Code 1036-42 (2d ed. 1980). Having found National Bank's interest perfected, the order of priority in accordance with the "first to file" rule is clear: first, National Bank, followed by Wholesale Supply, and then RepublicBank.[9] This determination of general priorities, however, does not end our inquiry.
 
 
 41
 The collateral at issue here is the gun shop inventory held by McBee at the time of bankruptcy. RepublicBank, the last creditor in time to file, clearly held a security interest in McBee's inventory. On the other hand, National Bank and Wholesale Supply, the initial creditors to file, held a security interest in the inventory, including "after-acquired property,"[10] of the gun shop when owned by Colley. This intervening bulk sale of the gun shop and its inventory from Colley to McBee raises the question of whether, and to what extent, the transferor's creditors, National Bank and Wholesale Supply, retain priority over the transferee's subsequent creditor, here RepublicBank. This question must be analyzed in light of the fact that the bulk sale from Colley to McBee was not made in accordance with the requirements of Article 6 of the U.C.C., dealing with bulk sales.
 
 
 42
 Article 6 of the U.C.C. defines, in general terms, the rights, liabilities and responsibilities of the parties to a bulk sale. As adopted in Texas, Section 6.105[11] requires that the transferee give notice to the transferor's creditors, in accordance with Section 6.107,[12] before the bulk transfer is made. This before-the-fact notice provision affords the transferor's creditors an opportunity to act before the sale to protect their security interests. Another protection, afforded by Section 6.106,[13] is a requirement upon the transferee to see that the relevant part of the proceeds of the sale finds its way into the hands of the transferor's creditors. Texas is among the minority of jurisdictions which has adopted this optional provision, providing further remedial concern for a transferor's creditors in a bulk sale.[14]
 
 
 43
 The provisions of Article 6, if complied with, also protect the transferee and his future creditors. Secured creditors of the transferor cannot assert any claims against the transferee or his property after a complying bulk transfer; the transferee will not "pay twice" for property thus freed from prior security interests. Similarly, the transferee obtains clear title to the transferred assets and may obtain credit on the unencumbered property. The transferee's creditors also need not be concerned with the possibility that prior creditors, in the chain of title, will assert previously perfected interests in the transferee's property.
 
 
 44
 If the provisions of Article 6 are not complied with, Sections 6.104 and 6.105 state that the transfer is "ineffective" against the transferor's creditors. Tex.Bus. & Comm.Code Ann. §§ 6.104, 6.105 (Vernon 1968). The term "ineffective" is nowhere explicitly defined in the Code, nor by Texas case law. In the immediate case, it is conceded that the transfer from Colley to McBee did not comply with Article 6, despite the fact that McBee had convenanted to comply with the bulk transfer provisions. The bankruptcy court examined the policies underlying Articles 6 and 9, as well as other specific provisions in both articles, and concluded that the term "ineffective" meant that the creditor's original interest and rights are unaffected by the transfer, and continue in the collateral as they would have if the collateral were still owned by the transferor. The court thus concluded that Colley's perfected creditors[15] retained their interest in the collateral, despite the transfer, and retained priority over transferee McBee's non-purchase money[16] creditors. We agree that these pre-transfer interests retain priority to the extent of the value of the inventory-collateral transferred in the noncomplying bulk sale.
 
 
 45
 In the absence of a bulk sales law, creditors generally would lose all security interest in collateral once transferred to a new owner;[17] the secured creditor's recourse would lie against the debtor-transferor, including an interest in any proceeds received by the transferor from the bulk sale.[18] In many cases, this would leave the secured creditor without any effective remedy. The value received upon transfer might be far less than that of the transferred collateral, or by the time the creditor learned of the transfer little, if any, of the sales proceeds might be recoverable from the debtor-transferor.
 
 
 46
 Article 6 of the U.C.C., as adopted by Texas, changes the relative position of the parties affected by a bulk sale. "The Bulk Transfers Act and related predecessors were enacted for the protection of creditors who sell goods and merchandise to others on credit for inventory and resale." Anderson & Clayton Co. v. Earnest, 610 S.W.2d 846, 848 (Tex.Civ.App.--Amarillo 1980). As summarized above, Article 6 places certain requirements upon the parties to the bulk sale. These requirements serve to notify the transferor's creditors of the intended sale, thus permitting the creditors to protect their security interests before the transfer. They also protect the transferee and his subsequent creditors by bringing to light and terminating all prior security claims to the transferred property.
 
 
 47
 Had Article 6 been complied with, transferor-Colley's secured creditors--National Bank and Wholesale Supply--would have retained no interest in the gun shop in McBee's hands. There is no evidence, however, of any attempt at compliance, although McBee had contracted to do so in her sale agreement with Colley. As a result, Colley's secured creditors were left without the benefit of Article 6's remedial provisions, most notably those requiring notice to the transferor's creditors. Furthermore, these creditors, National Bank and Wholesale Supply, were unable to avail themselves of the additional remedial provision, Section 6-106, adopted in a minority of jurisdictions including Texas, which requires a transferee to see that the relevant part of the proceeds of the sale finds its way into the hand of the transferor's creditors.
 
 
 48
 The Code provides that this total noncompliance makes the transfer "ineffective" as to the transferor's creditors. Given the remedial purpose behind Article 6, particularly as adopted in Texas, it is clear that by "ineffective" the Code drafters intended that the pre-transfer security interests survive the transfer, despite the fact that the collateral is no longer owned by the debtor. RepublicBank argues that this result is untenable, particularly with regard to new property purchased by the transferee and never owned by the transferor. At first glance, this argument is appealing: how can a debtor-transferor give his secured creditors an interest in property he no longer owns and, more significantly, in post-transfer property acquired by the transferee which the transferor never owned?
 
 
 49
 Upon analysis, however, the facial logical persuasiveness and the equitable underpinning of this argument disappears. The transferor gives his creditors a security interest in his property which may, as in the immediate case, cover "after-acquired property." It is Article 6, which provides as a "sanction for non-compliance" that the transfer is ineffective against creditors of the transferor. Tex.Bus. & Comm.Code Ann. § 6.106 official comment 2 (Vernon 1968). If this result were not reached, the remedial purposes behind Article 6 would be severely, if not wholly, undercut. The entire Article could be ignored with impunity; the remedial notice provisions, which serve to awaken unknowing creditors to press their claims before transfer, would be avoided. Clearly, a transferee cannot complain if, by his non-compliance, the transferor's creditors' claims attach to his property as they had prior to sale.
 
 
 50
 The immediate case proves the importance of the statutory requirement. Transferee McBee cannot complain. She was aware of National Bank's interest in the inventory and after-acquired property of the gun shop, yet she breached her specific covenant to comply with Article 6 in her sale agreement with Colley. Nor can the transferee's creditors be heard to complain of the protections afforded the transferor's creditors. The transferee's creditors should inquire as to a debtor's source of title where circumstances warrant. See Tex.Bus. & Comm.Code Ann. § 9.402(g) official comment 8 (Vernon Supp.1982-1983). Where, as in the immediate case, a bulk transfer has recently taken place, a subsequent creditor can and should inquire as to whether the transfer complied with Article 6. We find that the underlying policies of the Code are best supported by an interpretation which favors the unknowing prior creditor over the subsequent potential creditor. It is more equitable to place the burden on the potential subsequent creditor to check Article 6 compliance upon application for credit than to require constant vigilance of a prior creditor who, in the absence of notification, may rightfully assume that no bulk transfer cutting off his security interest has occurred.
 
 
 51
 We find further support for our conclusion in the statutory pattern. The transferor's creditor is not saved harmless forever in a non-complying bulk transfer. Article 6 limits the period in which a transferor's creditor may assert a security interest to six months after the non-complying bulk transfer, unless there has been concealment of the transfer. Tex.Bus. & Comm.Code Ann. § 6.111 (Vernon 1968). This limitations period evidences a policy that at some point a diligent creditor should realize that a transfer has occurred absent concealment of that fact and despite his lack of notice. If the prior creditor does not exercise such diligence, his security interest in the transferred property is lost. This time limitation was met in this case by National and Wholesale Supply.[19] The time limitation supports our conclusion that Article 6 is a reasonable and balanced provision in preserving the security interests of the transferor's creditors effective against the transferee.
 
 
 52
 RepublicBank relies upon two cases interpreting the Alabama version of the U.C.C. as compelling an opposite result: Bill Voorhees Co. v. R & S Camper Sales, 605 F.2d 888 (5th Cir.1979); Get It Kwik of America v. First Alabama Bank, 361 So.2d 568 (Ala.App.1978). We find these cases significantly distinguishable. Both cases held that the transferee was not personally liable for the transferor's original debt because of the transferee's noncompliance with Article 6. Bill Voorhees, supra, 605 F.2d at 890 (citing Get It Kwik for this proposition). Our conclusion today is not in conflict with these holdings. The question of personal liability is not before us. We found, supra, that noncompliance with Article 6 results in the retention of the transferor's creditors' security interest in the collateral despite its transfer to a new owner. Colley's creditors, National Bank and Wholesale Supply, have not sought relief on the ground that McBee was personally liable for Colley's business debt, as had the creditors in Bill Voorhees and Get It Kwik. As recognized in the cited cases, these theories of recovery are narrowed to specific liabilities. A transferor's creditor may be entitled to recover the value of the collateral even though the transferee is not personally liable for the debt. Cf. Anderson & Clayton Co. v. Earnest, 610 S.W.2d 846, 848 (Tex.Civ.App.--Amarillo 1980) (transferor's creditors' relief is obtained primarily from and against the asset transferred in bulk; personal liability of the transferee arises only under limited circumstances); Get It Kwik, supra (transferee not personally liable under Alabama U.C.C., but transferor's creditor entitled to recover value of transferred collateral under a conversion theory).
 
 
 53
 The sagacity behind this distinction is self evident. Noncompliance with Article 6 without the saving provisions would deprive transferor's creditors of the opportunity to secure their interests existing at the time of the transfer. They would be deprived, in the absence of compliance, of the value of the collateral which is transferred. As we interpret Article 6, its policies and specific provisions rendering the transfer "ineffective" are furthered by permitting the secured creditor to recover this value. But, it is questionable whether Article 6 goes further to contemplate the clearly greater "sanction" of personal liability, which might result in the transferor creditor's receipt of more value than that which was transferred.
 
 
 54
 Further, the Alabama U.C.C. construed in Bill Voorhees Co. and Get It Kwik does not adopt the optional remedial provision, Section 6.106, adopted in Texas. Both this Court in Bill Voorhees Co., supra, 605 F.2d at 891, and the Alabama court in Get It Kwik, supra, 361 So.2d at 571, found this absence significant in reaching the conclusion that personal liability does not arise under the U.C.C. as adopted in Alabama. As analyzed in Bill Voorhees Co., supra, 605 F.2d at 891, the optional remedy provision as contained in the Texas law "evidence[s] a legislative intention to treat the transferee like a trustee" who "must account for the bulk property or be held accountable for the proceeds of its sale." While the Texas courts might only extend personal liability in narrow circumstances, despite the adoption of Section 6.107 in their U.C.C., they clearly have adopted this "trustee" analysis of a transferee in a non-complying bulk transfer. As stated by one court:
 
 
 55
 "Failure of the purchaser to comply with the Bulk Sales Law fixes his liability as that of a receiver, and he becomes bound to see that the property, or its value, is applied to the satisfaction of claims of the creditors of the seller. In other words, he becomes a trustee, charged with the duties and liabilities of a trustee. Under the law he is charged with liability only to the extent of the value of the property received by him and his liability is to all the creditors pro rata."
 
 
 56
 Anderson & Clayton Co. v. Earnest, 610 S.W.2d 846, 848 (Tex.Civ.App.--Amarillo 1980) (quoting Southwestern Drug Corp. v. McKesson and Robbins, 172 S.W.2d 485, 487 (Tex.1943).
 
 
 57
 RepublicBank argues that Section 6.110 protects its interest from those of the transferor's creditors. Section 6.110 provides that:
 
 
 58
 When the title of a transferee to property is subject to a defect by reason of his noncompliance with the requirements of this chapter, then:
 
 
 59
 (1) a purchaser of any of such property from such transferee who pays no value or who takes with notice of such noncompliance takes subject to such defect, but
 
 
 60
 (2) a purchaser for value in good faith and without such notice takes free of such defect.
 
 
 61
 Tex.Bus. & Comm.Code Ann. § 6.110 (Vernon 1968). RepublicBank reasons that: (1) there is no finding or evidence that it had notice of McBee's failure to comply with Article 6; (2) the term "purchaser" includes a secured party such as RepublicBank under U.C.C. §§ 1.201(32), (33); and therefore (3) its interest is held free of any prior security interests by operation of Section 6.110(2).
 
 
 62
 This argument is not persuasive. While it is true under the Code that the general term "purchaser" may include a secured party, we find it clear that the term as used in Section 6.110 was not intended to include secured creditors.
 
 
 63
 As we find, supra, Article 6 clearly contemplates that transferors' creditors retain their security interest in the transferred collateral in the event of total noncompliance. This contemplated result would be frustrated were an extensive reading given to the term "purchaser" in Section 6.110 to cover subsequent creditors. Further we doubt whether a subsequent creditor could assert a claim that it took its interest "without notice." If a prior security interest is perfected, the burden is on the subsequent creditor to search for that claim. His failure to receive actual notice cannot be held as a defense to the priority of the prior perfected lien. Since Article 6 clearly provides that after a non-complying bulk transfer the transferor creditors' security interests remain effective, such interests may not be cut off by a broad reading of Section 6.110 at odds with the specific purpose behind Article 6.
 
 
 64
 RepublicBank further argues that Article 9 of the Code limits Colley's creditors' security interests to the particular collateral in the stock in trade at the time of the bulk transfer and remaining with McBee at the time of bankruptcy. The argument is that the security interest does not extend to any new inventory even if of lesser value than that transferred. The contention is not persuasive. Nothing in Article 9 limits this interest to the particular inventory which was transferred between Colley and McBee. Rather, as recognized in the very case relied upon by RepublicBank, Article 9 compels a contrary conclusion. Get It Kwik, supra, said:
 
 
 65
 The vast majority of jurisdictions hold that when a security interest is taken in the inventory of a business, after acquired inventory is automatically covered unless it is clearly set out that only certain items of inventory are to be covered. See In re Nickerson & Nickerson, Inc., 9 U.C.C.Rep. 886, 329 F.Supp. 93 (DCD Neb.1971).
 
 
 66
 As the court in In Re Page, 16 U.C.C.Rep. 501, 504 (DCMD Fla.1974), stated:
 
 
 67
 "Needless to say, any reasonable secured party would be fully aware that this type of business presupposes a constant change in the inventory. Therefore, it is obviously unreasonable to assume that anyone would have received or acquired or intended to acquire a security interest in an inventory with the rigid limitation that it should be limited to the same items which made up the inventory on the date the document was executed."
 
 
 68
 This approach is consistent with the general liberal philosophy of the U.C.C. and is certainly the prevailing and accepted commercial practice in financing retail merchandising businesses.
 
 
 69
 361 So.2d at 573-74. Texas adheres to the majority rule that an interest in inventory is generally assumed to cover after-acquired inventory, and that a secured party's interest in the new inventory remains perfected. See Borg-Warner Acceptance Co. v. Wolfe City National Bank, 544 S.W.2d 947, 950 (Tex.Civ.App.--Dallas 1976) (citing §§ 9.108, 9.203, 9.204 of the Texas U.C.C.).
 
 
 70
 In the immediate case, all of the secured parties had a security interest in the after-acquired property. By virtue of transferee McBee's failure to comply with Article 6, this security interest in the ever-changing inventory-collateral remained effective. RepublicBank's contention that Colley's creditors' interest, if any, was limited to the actual inventory transferred and which remained with the gun shop at the time of bankruptcy is therefore without merit. While National Bank and Wholesale Supply's priority is limited to the overall value of the inventory transferred in bulk to McBee,[20] it is not limited to the actual inventory remaining and traceable to the bulk sale.[21]
 
 
 71
 We thus conclude that National Bank, as first, and Wholesale Supply, as second, are entitled to priority in the inventory of transferee McBee given the latter's noncompliance with Article 6. Their security interest in the inventory of Oak Hill Gun Shop remained perfected and attached to the inventory after the transfer to McBee.
 
 IV. CONCLUSION
 
 72
 The bankruptcy court erred in concluding that under § 9.402(g) of the Texas U.C.C. National Bank's security interest in the gun shop collateral was unperfected. Accordingly, all three creditors held perfected security interests. We also conclude that the security interests of National Bank and Wholesale Supply remained perfected and attached to the gun shop inventory despite its bulk transfer to McBee, in light of McBee's failure to comply with Article 6 of the U.C.C., as adopted in Texas. These prior, perfected interests retained their priority over the later security interest filed by RepublicBank in the same inventory, to the extent of the value of the inventory-collateral transferred from Colley to McBee. Accordingly we remand to the bankruptcy court with instructions to enter an order granting priority first to National Bank, to the extent of the value of the inventory-collateral transferred to McBee, and then to Wholesale Supply; RepublicBank's priority is limited to the excess value, if any, of the inventory-fund over that of the inventory transferred to McBee.
 
 
 73
 REVERSED AND REMANDED.
 
 
 
 [1]
 National Bank of Texas was known as "Union National Bank" at the time of the proceedings below
 
 
 [2]
 RepublicBank-Austin was known as "State Bank," at the time of the proceedings below
 
 
 [3]
 We have jurisdiction of this direct appeal from the bankruptcy court's order, pursuant to 28 U.S.C. § 1293(b), which provides for such appeal upon agreement of the parties
 
 
 [4]
 Texas' interpretation of the Uniform Commercial Code, as adopted by that state, is controlling. However, given the novelty of many of the questions raised, we must resort to other sources to determine the results intended by the Code, as adopted by Texas
 
 
 [5]
 Wholesale Supply did not appeal from the bankruptcy court's order. It did, however, participate in the appeal. At oral argument, Wholesale Supply took the position that the bankruptcy court erred in giving it first priority in the bankrupt's assets; it argued that National Bank should properly be afforded first priority and that it should properly have been relegated to a position of second priority
 
 
 [6]
 In In re Glasco, Inc., 642 F.2d 793 (5th Cir.1981), this Court found this distinction between personal and business loans critical. The Court held that a creditor had a perfected security interest although it had filed in the debtor's business, or trade, name ("Elite Boats, Division of Glasco, Inc.") rather than its legal corporate name ("Glasco, Inc."). In distinguishing prior case law, we reasoned:
 These cases generally hold that a financing statement listing only the trade name as the debtor will be insufficient to perfect a security interest effective against the individual. See, e.g., In re Leichter, 471 F.2d 785 (2d Cir.1972); Citizens Bank v. Ansley, 467 F.Supp. 51 (M.D.Ga.), affirmed without opinion, 604 F.2d 669 (5th Cir.1979). But see In re Platt, 257 F.Supp. 478 (E.D.Pa.1966). There is a crucial distinction, however, between these cases and the case here. In the former, a single debtor is necessarily held out to the credit community under two names, that of the individual and of the business. The individual's credit for personal needs is unrelated to the business. A personal creditor would not necessarily be aware of the business or trade name, and thus may not discover security interests filed solely under the business name. In the present case, where the company does business only under one name, the opportunity for creditors to be misled is substantially reduced, even though that name is not the company's "true name." See [ Siljeg v. National Bank of Commerce, 509 F.2d 1009, 1012 (9th Cir.1975) ].
 We find this reasoning persuasive and equally applicable here. Although Glasco involved a corporate rather than individual debtor, as is here the case, the question raised by either filing is identical: whether a "trade name" filing is sufficient under § 9.402(g).
 
 
 [7]
 As we have concluded supra, the gun shop was not a partnership but was a sole proprietorship owned by Colley before its sale to McBee
 
 
 [8]
 RepublicBank argues that National Bank's initial imprudence in failing both to ascertain the veracity of McBee's partnership claim and to file under the individual name should be the focus of our inquiry. Clearly, National Bank should have investigated McBee's partnership claim before extending a loan. Its failure to do so jeopardized the effectiveness of a security agreement which could otherwise, and easily, have been perfected by multiple filings if the truth had been known. This prior imprudence, however, is not relevant to the question at hand: whether the filing made would have provided notice to a reasonably prudent subsequent creditor. We find that the U.C.C., as adopted in Texas, requires this broad inquiry, rather than the simplistic, rigid test proffered by RepublicBank, i.e. filing under a trade name is always insufficient where the business is a sole proprietorship
 
 
 [9]
 Wholesale Supply might possibly have asserted the "purchase money security interest" exception to this rule, to gain first priority over National Bank despite the latter's earlier filing. Tex.Bus. & Comm.Code § 9.312(c) (Vernon 1968 & Supp.1982-1983). Wholesale Supply, however, does not assert such priority. It concedes that it took its security interest subject to National's prior interest and should have second priority
 
 
 [10]
 All three secured creditors executed security instruments covering after-acquired property. See Borg-Warner Acceptance Corp. v. Wolfe City National Bank, 544 S.W.2d 947, 950 (Tex.Civ.App.--Dallas 1976) ("all inventory" automatically includes after-acquired inventory)
 
 
 [11]
 Section 6.105 provides:
 § 6.105. Notice to Creditors
 In addition to the requirements of the preceding section, any bulk transfer subject to this chapter except one made by auction sale (Section 6.108) is ineffective against any creditor of the transferor unless at least ten days before he takes possession of the goods or pays for them, whichever happens first, the transferee gives notice of the transfer in the manner and to the persons hereafter provided (Section 6.107).
 
 
 [12]
 Section 6.107 states:
 § 6.107. The Notice
 (a) The notice to creditors (Section 6.105) shall state:
 (1) that a bulk transfer is about to be made; and
 (2) the names and business addresses of the transferor and transferee, and all other business names and addresses used by the transferor within three years last past so far as known to the transferee; and
 (3) whether or not all the debts of the transferor are to be paid in full as they fall due as a result of the transaction, and if so, the address to which creditors should send their bills.
 (b) If the debts of the transferor are not to be paid in full as they fall due or if the transferee is in doubt on that point then the notice shall state further:
 (1) the location and general description of the property to be transferred and the estimated total of the transferor's debts;
 (2) the address where the schedule of property and list of creditors (Section 6.104) may be inspected;
 (3) whether the transfer is to pay existing debts and if so the amount of such debts and to whom owing;
 (4) whether the transfer is for new consideration and if so the amount of such consideration and the time and place of payment; and
 (5) if for new consideration the time and place where creditors of the transferor are to file their claims.
 (c) The notice in any case shall be delivered personally or sent by registered mail or certified mail to all the persons shown on the list of creditors furnished by the transferor (Section 6.104) and to all other persons who are known to the transferee to hold or assert claims against the transferor.
 
 
 [13]
 This section provides:
 § 6.106. Application of the Proceeds
 In addition to the requirements of the two preceding sections:
 (1) Upon every bulk transfer subject to this chapter for which new consideration becomes payable except those made by sale at auction it is the duty of the transferee to assure that such consideration is applied so far as necessary to pay those debts of the transferor which are either shown on the list furnished by the transferor (Section 6.104) or filed in writing in the place stated in the notice (Section 6.107) within thirty days after the mailing of such notice. This duty of the transferee runs to all the holders of such debts, and may be enforced by any of them for the benefit of all.
 (2) If any of said debts are in dispute the necessary sum may be withheld from distribution until the dispute is settled or adjudicated.
 (3) If the consideration payable is not enough to pay all of the said debts in full distribution shall be made pro rata.
 
 
 [14]
 White and Summers found that in 1980 eighteen states, including Texas, had enacted this provision. See J. White & R. Summers, Uniform Commercial Code 758 & n. 12 (2d ed. 1980)
 
 
 [15]
 The court had, erroneously, found only Wholesale Supply to have a perfected security interest. As we concluded, supra, National Bank's interest was perfected as well
 
 
 [16]
 RepublicBank does not maintain that it possessed a "purchase money security interest." Under Article 9, these security interests hold a special position as an exception to the "first-to-file" rule. That is, if properly created, purchase money security interests may have priority over previously filed and perfected security interests. See Tex.Bus. & Comm.Code Ann. §§ 9.302(a), 9.312(c)(d), (Vernon 1968 & Supp.1981-1983)
 
 
 [17]
 See generally J. White & R. Summers, Uniform Commercial Code 768 (2d ed. 1980)
 
 
 [18]
 Article 6 does not contain any general rules of priority among creditors. Article 9, on secured transactions, sets out these rules. Among these are provisions which attempt to define the extent to which a security interest follows the proceeds of a sale of collateral and/or the collateral itself. See, e.g., Tex.Bus. & Comm.Code Ann. §§ 9.306, 9.312
 RepublicBank argues that the provisions of Article 9 alone are relevant, and that the bankruptcy court's reliance on Article 6 is misplaced. We strongly disagree. Clearly, Article 9, covering secured transactions, sets forth the general principles for determining security conflicts. Article 6, by contrast, sets forth specific rules to govern the limited context of bulk sales. If the immediate case did not involve a bulk sale, Article 6 would be of no relevance. Yet this is not the case at hand. The bulk sale between Colley and McBee directly gives rise to RepublicBank's claim that National Bank and Wholesale Supply's prior perfected interests did not attach to McBee's interest in the gun shop. Accordingly, the specific provisions of Article 6 must be scrutinized in determining the validity of RepublicBank's claim.
 
 
 [19]
 In the immediate case, the transfer occurred on May 5, 1980. The transferor's creditors asserted their interest in the gun shop's inventory here at issue in October 1980, before the six-month period expired. We agree with the bankruptcy court that the four-month period for refiling upon a name change of the debtor under Article 9, Tex.Bus. & Comm.Code Ann. § 9.402(g) (Vernon 1982-1983), does not apply here. If this general Article 9 provision applied, it would in effect reduce the specific provision in Article 6 from six to four months. Where, as here, a specific section of the Code applies to a particular situation, the specific provision should govern. Thus, the six-month period in Article 6, relating to non-complying bulk sales, was correctly applied by the bankruptcy court
 
 
 [20]
 The trustee in bankruptcy is not a party to this proceeding. We note, however, that under the Bankruptcy Act an after-acquired property interest in collateral to the extent of the value of the collateral at a set pre-bankruptcy date may only be valid against the trustee. 11 U.S.C. § 547. Thus, under the Act, a secured creditor--even without an intervening bulk sale--might not be able to enforce his "floating" lien for the greater value of inventory at the time of bankruptcy. See J. White & R. Summers, Uniform Commercial Code 1007-11 (2d ed. 1980). Without deciding whether the result we reach is required by this section of the Bankruptcy Act, we note its consistency with the result we reach under the U.C.C
 
 
 [21]
 RepublicBank argues that § 9.306 limits Colley's creditors' perfected security interests to the precise inventory which remained from the transfer because there was insufficient evidence that the new inventory was purchased directly and exclusively from the proceeds of the sale of the guns as is required to maintain continued perfection under that section. We reject RepublicBank's proffered application of § 9.306(b) to the issue at hand. Here, the "original collateral" included not only presently-owned inventory but after-acquired inventory as well. This sort of floating lien, as discussed supra, reflects the commercial reality that inventory is fluid. Constant refiling, to achieve perfection, could not have been contemplated by the Code's drafters. The Code provides a special mechanism for subsequent purchase money security creditors to obtain priority over prior, floating liens in inventory. See Tex.Bus. & Comm.Code Ann. § 9.312(c) (Vernon Supp.1982-1983). RepublicBank's subsequent security interest, however, does not fit into this special priority category