F. A. Thomas Machine Co. *vs.* George W. Voelker.      | 23  441 |
                                                       | 24  318 |

PROVIDENCE—DECEMBER 27, 1901.

Present : Stiness, C. J., Tillinghast and Rogers, JJ.

(1)  *Trover.   Contracts.   Evidence.   Measure of Damages.*

In an action of trover for the conversion of a machine which the plaintiff claimed as his property under an oral contract entered into with the defendant, where the terms of the contract are in dispute the defendant may properly inquire of the plaintiff in cross-examination as to whether the machine was held by the latter as security for an indebtedness and as to the state of the account between the parties, for the purpose of negativing the plaintiff's claim of right to possession, and for the further purpose of fixing the measure of damages.

(2)  *Trover.   General and Special Owner.   Damages.*

It is not necessary in an action of trover that the absolute title to the property should be in the plaintiff; it is enough if he stands in such a relation to it that he is entitled to the possession of it and will be liable ultimately to the true owner for its value unless it is returned to him. As against the general owner, however, or one claiming under him, the owner of a limited interest can recover only the value of such interest.

TRESPASS ON THE CASE for trover.  The facts are stated in the opinion.  Heard on petition of defendant for new trial, and petition granted.

ROGERS, J.   This is an action of trover for the conversion of a rotary cloth press, wherein, after a verdict for the plaintiff for $634, the defendant petitions for a new trial on the grounds that the verdict was against the law and the evidence and the weight thereof, and that the court erred in its rulings in improperly admitting testimony on the part of the plaintiff, and in improperly excluding testimony offered by the defendant.

The plaintiff, Fred A. Thomas, who in 1892–3 did business under the name of the F. A. Thomas Machine Company, was a manufacturer of cloth presses and other machines ; and the defendant, George W. Voelker, who did business under the name of George W. Voelker & Co., was an inventor and the owner of certain patents relating to cloth presses, and the

construction thereof.    In 1892 the defendant did not build the presses himself but procured the plaintiff to build them for him, and thus the defendant supplied machines for the customers to whom he had sold them.    There is much diversity in the testimony of the parties as to the time of payment for making the machines under the general contract relating to building them prior to the construction of press No. 12 ; and also as to the contract for that particular press in regard to which this suit was brought, while the writings relating thereto are ambiguous, and the intent and meaning· to be drawn therefrom is far from being plainly stated or easily understood.

The plaintiff swears that at the commencement of their dealings the defendant was to pay him cash for the machines at the time they were delivered completed ; that at the time of building press No. 12 the plaintiff was to have $742.50 for building each machine ; and that the defendant was to furnish the cylinder and the stuffing-box, the stuffing-box being $7.50 and the cylinder $100, which were purchased by the defendant from other parties.    The defendant swears that he was to pay the plaintiff for the machines only as soon as he received his pay for them from the people he should sell them to.    The machines were built after the defendant's patterns and under his patents, so that the value of the machines considerably exceeded the amount the defendant was to pay the plaintiff for making them, the value being put at $1,250 a machine.

But whatever the general contract as to the time of payment may have been, it is certain that in the course of their dealings the defendant became indebted to the plaintiff.

The ordinary course of dealing between the parties had been for the defendant to direct the plaintiff to build one or more presses ahead of actual sales by the defendant, so that when a press was sold by the defendant there might be one on hand completed, or in an advanced stage of construction, in order that the defendant might deliver more promptly than he could have done had he waited to direct one to be built until he had actually sold it.

The plaintiff, not having confidence that future bills would be paid by the defendant, had a talk with him on the subject, the statements of the parties as to which varied radically. The plaintiff's statement was substantially that the defendant told him that he could have this No. 12 rotary cloth press, that he could collect the money for it, and that the defendant would find a customer for him ; that the machine was to be the plaintiff's property, and that the plaintiff was to bill it and collect the pay for it ; and that the defendant would set the machine up and furnish a roll for it. This was late in October or early in November, 1892.

The defendant denied that there was any agreement that the machine was to be the plaintiff's property but agreed that the plaintiff was to collect pay for it, when sold, and was to apply it to reducing the account between them.

Subsequently the defendant wrote to the plaintiff as follows, viz.:

"NOVEMBER 7th, 1892.

"F. A. THOMAS MACHINE CO.

"DEAR SIRS :—Please finish Press No. 12 at once and ship to Jamestown Worsted Mill, Jamestown, New York, by way of Worcester. You can bill this machine and collect for same which would be, if satisfactory, $1,250, travelling expenses for setting up charged extra, which I will send you and you can collect it all in one bill. This will make us very near square. You have charged me with two brass linings— where did you send them ?

"Yours very truly,

"GEORGE W. VOELKER & CO."

On the next day the plaintiff wrote the defendant as follows, viz.:

"WOONSOCKET, R. I., November 8th, 1892.

"GEORGE W. VOELKER & CO.

"GENTLEMEN : Enclosed please find our receipt for $1,270, money received from the Faulkner Manufacturing Co. The brass linings which were charged to you were those sent to

the Faulkner Manufacturing Co. at North Billerica, Mass. We enclose bills showing the condition of our books to date. After giving you credit for $14.70 there still remains $688.56 on the old bill, dated Sept. 13, 1892.   If you will give us $400 in cash now and the balance in cash when you get paid for the machine removed from Saugus we shall consider the matter well settled.   The machine we are to send to the Jamestown Worsted Mill is to run in competition with a Miller press. The one proving the better to be accepted.

" Yours truly,

" F. A. THOMAS MACHINE CO.

" *F. A. Thomas, Manager.*"

Twenty days later, to wit, about November 28, 1892, the plaintiff shipped press No. 12 to the Jamestown concern, billing it to them as sold by the plaintiff.   The plaintiff never received any payment from the Jamestown Worsted Co., never authorized the defendant to receive payment therefor, or to remove the machine from that company's premises ; but it is proved without contradiction that the defendant did remove it without the plaintiff's permission.

The first point of difference between the parties was as to what was the agreement.   The plaintiff claimed it was one thing ; the defendant claimed it was another ; and in order to show that it could not, in reason, have been as the plaintiff claimed it was, because such an agreement would have paid the plaintiff several hundred dollars more than was due him from the defendant, thus bringing the plaintiff in debt to the defendant for overpayments, the defendant in cross-examination of the plaintiff inquired as to the state of the account between them, particularly as to an amount received for a machine sent to the Washington Mills.   The court ruled the question out, whereupon the defendant excepted. Subsequently it came up again, squarely, as to whether this agreement was not made for security,—plaintiff, counsel and court all seeming to assume that trover would not lie unless the title was absolute and unqualified.   Upon the defend-

ant's cross-examination of the plaintiff, the latter swore as follows, viz. :

"Q.   What was the contract, Mr. Thomas, for the building of this machine" (viz. Press No. 12) "as entered into between you and Mr. Voelker at the time you received the order to build it?

"A.   We received this order to go ahead with three machines.   I was to have $742.50 for these machines, he to furnish the cylinder and the stuffing-box which went into the end.   That stuffing-box was $7.50 and the cylinder was $100—$742.50—that was the order which we received for three machines. `

"Q.   What were the terms of the building of this machine at the time the order was accepted as to the time of payment?   A.   Those machines were to be paid for at the time they were delivered.

"Q.   That was the general contract?   A.   That was the contract we started out with when we began business, to pay for machines as soon as they were delivered.

"Q.   Now, when you sent for Mr. Voelker to come to your shop shortly after Nov. 2d and had an interview with him, in which it was agreed, according to your testimony, that the machine should remain yours, what was the object of that agreement?   A.   The object of that agreement was to secure me in past accounts and for that machine.

"Q.   Then that contract was made and that right given for security, was it?   A.   No, it was not for security because the machine had not been delivered.   It was to protect the concern.

"Q.   And if you received your money elsewhere for what was due you your right to that machine thereby ceased, did it not?   A.   No, there was no such contract made ; that machine was made mine.

"Q.   Then it was given for security?   A.   It was given in lieu—No, I should not say security, for it could not be security until after the machine had been delivered.   For the contract was with him on the old contract, of (sic) it stood, it could not be given as security.

"Q.    It was not a gift to you, was it?    A.    Oh, no sir.

"Q.    You testified yesterday it was not in payment of any of your accounts?    A.    No sir.

"Q.    Then it was given to secure your indebtedness, was it not, the indebtedness that was due. from Mr. Voelker to you?    A.    Partly.

"Q.    And the other part, for such indebtedness as might arise on the part of that machine?    A.    That machine would be charged in with other accounts if there was no such agreement made."

(1)    At this point the plaintiff's counsel objected, and the defendant's counsel in urging his right to proceed with the examination in regard to what the press sent to the Jamestown concern was security for, or what was the consideration of the agreement in regard to it, used these words:—"If the Court please, yesterday I submitted the question in regard to whether Mr. Thomas received payment on account of the Washington machine, if he had received the money from the Washington Mills, and the court ruled that out.    Now it appears from this testimony of this witness that the Jamestown machine, the right to collect on that was given as security for the claim which Mr. Thomas had against Mr. Voelker.    Now, it is therefore a security for the debt, and if the debt is wiped out the security is wiped out and the right ceases.    Now, it is proper to ask whether Mr. Thomas received money and how much on account of Mr. Voelker, as it seems to me."    After a very long discussion of the matter, involving the taking of some explanatory testimony, in the course of which the court said:—"I understand from Mr. Thomas that he manufactured these machines; that Mr. Voelker sold those machines, here, there, and everywhere he could, and that Mr. Voelker was owing him something like $1,200 or plus.    Now it does not make any difference whether Mr. Voelker was indebted to Mr. Thomas or the Thomas Mfg. Co.    The simple question is whether he took that machine and converted it to his own use."

The result was that the court refused to allow the defendant to inquire of the plaintiff further as to whether press

No. 12 was held by the latter as security, and as to the state of the account between them at the time of the bringing of the suit, to which rulings the defendant duly excepted.

We think the ruling was erroneous. The question before the court was as to what was the contract. The plaintiff claimed it was one thing, the defendant that it was quite a different thing, and that the state of the account between the parties would demonstrate the utter improbability of its being what the plaintiff claimed it was. Merely because the plaintiff in his direct had sworn that the agreement was one thing did not preclude the defendant from showing on the cross-examination that it was something quite different. The letters of November 7 and 8, 1892, were ambiguous and did not clearly state what the contract as to press No. 12 was, and oral evidence was properly admissible to show the intent of the parties. *Phetteplace* v. *Brit. & For. Marine Ins. Co.*, 23 R. I. 26, 31.

The plaintiff had just sworn, as we have seen, that press No. 12 was not a gift, that " the object of that contract was to secure me " (the plaintiff) " in past accounts and for that machine ; " that " it was to protect the concern," etc., but when the corollary or necessary inference of such admissions was put interrogatively, in this wise :—" And if you received your money elsewhere for what was due you, your right to that machine thereby ceased, did it not ? ", the plaintiff shrank from admitting it, and replied, " No, there was no such contract made ; that machine was made mine." What was the contract as to press No. 12, was the very forefront of the case, and evidence to support the defendant's claim as to it was just as admissible as evidence supporting the plaintiff's claim.

(2)    The defendant had some interest in press No. 12, as it was built upon his order and under his patents :. for its cost he was to be responsible : the amount for which it sold was to be applied to affect the account between him and the plaintiff ; and whether it had ever been formally delivered by the plaintiff to the defendant after its completion, or not, it was delivered by the plaintiff to a supposed customer for the pur-

pose of being converted into cash, which was to be used by the plaintiff in some manner to reduce the defendant's debt to him, if any such debt existed. The plaintiff's testimony tends to show, or at least it may be fairly claimed that it tends to show that, and if the defendant neither owed for building press No. 12, nor on old account, the plaintiff had no beneficial interest in it. The testimony ruled out, then, would have been admissible, if not absolutely necessary, to fix the measure of damages, for if that press was not a gift, nor bought by the plaintiff,—and it is not pretended that it was either,—but was to protect or secure the plaintiff for the plaintiff's claim for building it, and also for any other debt from the defendant to the plaintiff, then the amounts so due, and not the full value of the machine, would have been the measure of damages the plaintiff could recover in this suit.

In this case it seems to have been considered that the plaintiff must have an absolute and unqualified title to the subject-matter of the suit, and that the measure of damages must necessarily be the value of the press. This was a misapprehension. A plaintiff in trover, of course, must recover upon the strength of his own legal title, and there must be a concurrence both of the right of property, general or special, and of the actual possession or the right to immediate possession, but it is not necessary that the absolute title should be in him; it is enough if he stands in such a relation to the property that he is entitled to the possession of it, and will be liable ultimately to the true owner for its value, unless it is returned to him. 26 A. & E. Enc. of Law, 744. As against the general owner, or one claiming under him, the owner of a limited interest can recover only the value of such interest. *Id.* 821.

In *Warner* v. *Vallily*, 13 R. I. 483, 487, which was an action of trover, this court speaking through Durfee, C. J., said : "Ordinarily, it is true, the measure of damages is the value of the goods converted with interest from the time of conversion. But the rule is not inflexible. It is everyday practice, when the plaintiff has only a qualified interest, to qualify the damages accordingly; as, for instance, where a

mortgagee under a chattel mortgage sues the mortgagor for converting the chattel, he recovers only to the extent of the debt secured with interest."

Evidently the jury from their verdict must have proceeded on some such basis, for the plaintiff in his letter of November 8, 1892, stated the balance to be $688.56, and their verdict was for $634, but a little more than $50 less than that alleged balance.

In our opinion the defendant should have been allowed to inquire as to the state of the account between him and the plaintiff, and his not being allowed to do so is ground sufficient for granting a new trial.

New trial granted, and case remitted to the Common Pleas Division for further proceedings.

*William G. Rich*, for plaintiff.

*George W. Greene*, for defendant.