HARLEY–DAVIDSON MOTOR CO.,
INC., and ITT Commercial Finance
Corp., Plaintiffs, Appellants,

v.

BANK OF NEW ENGLAND—OLD COL-
ONY, N.A., Defendant, Appellee.

No. 89–1671.

United States Court of Appeals,
First Circuit.

Heard Dec. 8, 1989.

Decided March 6, 1990.

Mark A. Stull with whom Gordon N. Schultz, Schultz & Bednarz, P.A., Boston, Mass., Stephen R. White, and Pucci & Goldin, Inc., Providence, R.I., were on brief, for plaintiffs, appellants.

James E. Purcell with whom Partridge, Snow & Hahn, Providence, R.I., were on brief, for defendant-appellee.

Before CAMPBELL, Chief Judge, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

A motorcycle manufacturer ("Harley") and a finance company ("ITT") loaned money to a motorcycle dealer ("Clemence") to help finance the dealer's *new* motorcycle inventory. To guarantee repayment they took and perfected a secured interest in the dealer's *entire*—new and used cycle—inventory and in all his motorcycle sale proceeds. Subsequently, a bank ("Old Colony") provided the dealer with a line of credit, primarily to help him buy *used* motorcycles. To guarantee repayment, the bank took and perfected a (junior) secured interest in the dealer's inventory. More importantly, the bank insisted that the dealer leave with it title documentation (which we shall refer to as "certificates") for particular used, and a few new, motorcycles. The bank released these certificates only as the dealer sold the individual cycles and repaid the bank's advances. The dealer went bankrupt.

The motorcycle manufacturer and the finance company brought this diversity action against the bank. They claim that the bank, by holding (as security for its advances) the title certificates of several new motorcycles, intentionally interfered with their senior "security agreement" contracts. They say the bank's practice caused the bankruptcy of the dealer, thereby preventing them from collecting all the money the dealer owed them and causing them to lose profits while they searched for a replacement dealer. They also claim that the bank's practice of holding the title certificates amounted to conversion, either (1) of the certificates themselves or (2) of motorcycle sale proceeds that the dealer consequently paid to the bank rather than to them.

The district court entered judgment for the bank on both sets of claims. The court, without hearing evidence, granted summary judgment for the bank on the conversion claim. 85 B.R. 1. After hearing evidence on the "contract interference" claim, it held for the bank on the ground that the plaintiffs failed to prove that the bank's practices caused the dealer's bankruptcy. The manufacturer and the finance company (Harley and ITT) now appeal. We conclude that the law entitles them to proceed to trial on one aspect of their "conversion" claims, but in all other respects we affirm the district court.

I.

*Background*

To understand the basis for our conclusions, the reader must keep the following factual background in mind:

1. The dealer, Richard J. Clemence, established his Harley–Davidson motorcycle dealership in 1982. The manufacturer, Harley, and the finance company, ITT, financed his acquisition of *new* motorcycles.

2. Clemence signed written security agreements with both Harley and ITT. The agreements each contain four terms of particular importance here:

   a. Each grants the secured party a secured interest in collateral that includes *all* Clemence's inventory, both new and used cycles, and the proceeds of their sale.

   b. Each forbids Clemence (without the secured party's consent) to create another security interest in the collateral.

   c. Each requires Clemence to pay back to the secured party the loan on any financed motorcycle immediately (e.g., within 24 hours) after Clemence sells the motorcycle.

d. Each defines "default" broadly to include Clemence's breaking of his promise not to encumber the collateral; and each permits the secured party to repossess the collateral upon default.

Harley and ITT each perfected its secured interest by filing financing statements with the Rhode Island Secretary of State in March 1982.

3. Subsequently, Old Colony provided Clemence with a line of credit designed to help him buy used motorcycles—old motorcycles that customers would trade in when they bought new ones. As we have said, Old Colony secured repayment in two ways. First, it obtained a secured interest in Clemence's entire inventory of new and used cycles, an interest which it perfected by filing financing statements in September 1983 and December 1984. Old Colony's secured interest was junior to the previously perfected secured interests of Harley and ITT. Second, before making a particular advance (under its line of credit), Old Colony required Clemence to sign a document called "Trust Receipt and Promissory Note," which identified a specific motorcycle, the value of which equalled or exceeded the amount of the advance; and it required Clemence to deposit with it the title certificate for each such identified motorcycle. It returned the title certificate to Clemence only when he repaid the advance. Since Clemence could not sell a motorcycle without delivering the title certificate to the buyer, this practice assured Old Colony that Clemence would likely use any money from the sale of a motorcycle immediately to repay the advance.

4. As a practical matter, Old Colony's "certificate holding" practice did not conflict with Harley's and ITT's collection efforts so long as Old Colony held only *used* motorcycle certificates. Suppose, for example, that Clemence bought a new motorcycle from Harley for which it owed Harley (or ITT) $7,000. Suppose he sold the cycle for $5,000 cash plus a used (trade-in) cycle worth $6,000. He could pay Harley back the $7000 almost immediately by giving Harley the $5,000 cash he received from the buyer, plus, say, $2,000 that he borrowed from Old Colony on the strength of the used cycle. When Clemence later sold the used cycle, he would simultaneously repay Old Colony.

Suppose, however, that Old Colony loaned money against (and held the certificate for) a *new* motorcycle that Harley (or ITT) had financed. This could create a financially awkward situation. Suppose, as above, that Clemence bought a new cycle from Harley, for which he owed Harley $7,000. Assume he then borrowed, say, $4500 from Old Colony, using the same *new* cycle as collateral. And assume, as before, that Clemence sold the new cycle for $5,000 cash plus a used (trade-in) cycle worth $6,000. He would now immediately have to repay Old Colony $4500 to get back the new cycle's title certificate, and he would then have only $500 in cash left to repay Harley its $7000 loan. Even if Clemence could sell the used cycle immediately, or use the cycle to secure a further $6000 advance from Old Colony, he would still end up with $500 less than he needs to repay Harley: the "double financing" of the new cycle has created a financial problem. Harley and ITT say that such financial problems caused Clemence's bankruptcy.

5. From September 1983, when Old Colony provided Clemence with a $50,000 revolving line of credit, through October 1984, when Old Colony increased the line of credit to $75,000, until June 10, 1985, when Clemence filed for bankruptcy, Old Colony issued "trust receipts", and held title certificates, for 53 motorcycles. It returned 41 certificates to Clemence as he repaid the relevant advances. It turned over the remaining 12 certificates to Harley soon after Clemence filed for bankruptcy. Until January 1985 (with one irrelevant exception) it held only *used* cycle title certificates. Between January and June 1985, however, it took *eight certificates for new, Harley- or ITT-financed motorcycles.* At any one time it held a maximum of *four* such certificates, securing an advance to Clemence of $18,666.

## II.

### *The Contract Interference Claim*

We consider first Harley's and ITT's appeal from the judgment against them on their "contract interference" claim. They focus, almost exclusively, upon the factual linchpin of the district court's decision, namely, its determination that, even if Old Colony improperly "interfered" with the earlier contracts, the interference (the "double financing") did not *cause* Clemence's bankruptcy (and, consequently, caused the plaintiffs no harm). Although conflicting factual evidence may have made the causation question difficult to decide in the trial court, that very circumstance makes it easier for us to decide the related legal question on appeal. The law permits us to overturn a factual finding such as this one only if it is "clearly erroneous," Fed.R.Civ.P. 52(a), which is to say, only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The conflicting evidence prevents us from having any such "firm conviction."

On the one hand, Harley and ITT built a factually strong case. They showed, through Clemence's own testimony, that his decision to file for bankruptcy on June 10, 1985, was "made and concluded on one day." They pointed out that, on that day, Clemence lacked the money he needed to pay ITT about $14,000 he owed it, yet Clemence had just paid Old Colony more than $18,000 for four "double financed" cycles. They produced financial experts who testified that, if only Clemence had not had to pay back this $18,000 at just that time, he could have paid his other current debts and avoided bankruptcy; and, if Old Colony had permitted Clemence to repay its loans on a monthly basis, say $3700 per month, instead of tying the repayment to release of the motorcycle certificates, he would not have had to pay back the $18,000 just then.

On the other hand, the record contains important contrary evidence. Clemence had a fairly large business, with sales of over $1 million per year. He had never made much money. At the end of 1984, his balance sheet showed a "deficit" of about $30,000. Clemence's efforts to raise a loan of $185,000 in 1984 failed when the Small Business Administration refused to guarantee the loan. Clemence testified that he "was always under pressure;" that his "checkbook was always very, very close;" that the "business had been marginal all along;" that his problems were "undercapitalization," "failure to realize the amount of sales ... projected, and perhaps somewhat inept management;" and that he "was dead" when he failed to get the SBA-guaranteed loan. Old Colony also impeached one of the plaintiffs' experts by pointing to inconsistent statements he had earlier made under oath in depositions (statements admissible as substantive evidence, Fed.R. Evid. 801(d)(1)). The expert had said that there was

> little doubt that Clemence had to be having problems earlier and would have gone down a hell of a lot sooner if the Bank hadn't made these inappropriate loans to him,

and that

> if anything, Clemence may have been dead early in 1984 and didn't know it. ... This guy was living on borrowed time.

Finally, the record suggests that the plaintiffs' experts rested their conclusions on the assumption that, in the absence of the "double financing," Old Colony would nonetheless have advanced Clemence a sizable amount of money with some other repayment arrangement, say, a term loan to be repaid in installments of $3700 per month (or that someone else would have given him the money he needed); but the record does not demonstrate that this was so.

Given this conflicting evidence, including Clemence's own testimony, and the absence of any legal requirement that a district court automatically adopt even an uncontradicted expert opinion as its own, *see, e.g., Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627–29, 64 S.Ct. 724, 728–30, 88 L.Ed. 967 (1944); *Woodling v. Garrett Corp.,* 813 F.2d 543, 558 (2d Cir.

1987), we simply cannot say that the district court's conclusion was "clearly erroneous."

■ Harley and ITT make several other arguments. They say that the district court should at the very least have awarded them a lesser amount of damages: the $14,000 amount of a specific "Clemence to ITT" check that might not have bounced had Clemence declared bankruptcy a few days later, or, at least, nominal damages. The short and conclusive answer to both these claims concerns their timing. Harley and ITT did not specifically focus upon the $14,000 check as presenting somewhat different causal issues until their motion under Fed.R.Civ.P. 59(e) asking the district court to alter or amend the judgment. Harley and ITT also first made a specific request for nominal damages (upon which they wish to rest a claim for attorneys' fees) in their Rule 59(e) motion. Rule 59(e) motions are aimed at *re* consideration, not initial consideration. *White v. New Hampshire Dept. of Employment Security,* 455 U.S. 445, 451, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982). Parties normally cannot use them to "raise arguments which could, and should, have been made before the judgment issued." *FDIC v. Meyer,* 781 F.2d 1260, 1268 (7th Cir.1986); *see Frito-Lay of Puerto Rico, Inc. v. Canas,* 92 F.R.D. 384, 390 (D.P.R.1981). Both sets of arguments differ significantly from those the parties made before judgment. In neither case are those arguments *obviously* correct. *See, e.g.,* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* 1002 (5th ed. 1984) ("It is generally agreed that proof of some damage is necessary to sustain the [intentional interference with contractual relations] action...."). Consequently, we cannot say that the district court acted unlawfully in refusing, after judgment, to hear them. *See Appeal of Sun Pipe Line Co.,* 831 F.2d 22, 25 (1st Cir.1987) (trial court has "substantial discretion in deciding whether to strike up the band again in order to allow the losing party to argue new material or a new theory"), *cert. denied sub nom. Sun Pipe Line Co. v. EPA,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

Harley and ITT make several other arguments, which, in our view, rest upon a premise that the district court concluded that (1) without the "double financing" of new motorcycles, Clemence's bankruptcy would not likely have occurred, but (2) even so, the "double financing" did not cause the bankruptcy. Although we can find some language in the district court's opinion that supports the appellants' theory, we do not believe that one can fairly read the opinion as a whole as setting forth the first of these propositions. Rather, in our view, the district court concluded that the "double financing" played *no significant role* in bringing about a financial failure that, by the time the "double financing" took place, seemed inevitable. And, as we have said, the record adequately supports that conclusion.

## III.

### *The Conversion Claims*

Harley and ITT also appeal the district court's entry of summary judgment against them on their claims that Old Colony converted (a) the 41 title certificates that Old Colony took to secure its advances to Clemence and did not return to Harley or ITT after Clemence's bankruptcy, and (b) the proceeds of some of Clemence's motorcycle sales. These claims may have less practical significance than the contract interference "causation" issue, for they likely involve less money. However, they raise far more difficult, and potentially more significant, legal issues.

### A.

### The Title Certificates

Harley and ITT point out that, between September 1983 and June 1985, Clemence permitted Old Colony to hold as collateral 53 motorcycle certificates. As Clemence repaid Old Colony's advances, Old Colony gave Clemence back 41 certificates. When Clemence went bankrupt, Old Colony turned over the remaining 12 certificates to Harley. Harley and ITT had perfected se-

curity interests in all 53 motorcycles, for they had perfected security interests in Clemence's *entire* motorcycle inventory (including any used motorcycles that he bought). Their security agreements with Clemence prohibited Clemence from transferring *any* of their collateral to a third party. Old Colony has no superior secured interest in the 53 motorcycles (such as a "purchase money" secured interest, *see* U.C.C. §§ 9–107, 9–312) that might entitle it to hold even the used motorcycles that Clemence used its advances to buy. Harley and ITT argue that, consequently, Old Colony "converted" the 41 certificates that it held as collateral and returned to Clemence rather than them. They seek $127,000 (the value of the 41 motorcycles) as damages for this "conversion."

The district court rejected their claim because, in its view, at the time of the claimed "conversion" of the 41 certificates, neither Harley nor ITT were (a) in possession, (b) entitled to present possession, or (c) entitled to future possession of those certificates. *See* Restatement (Second) of Torts §§ 224A, 225, 243 (in order to bring a conversion action, plaintiff, at the time of conversion, must have been either in possession, or entitled to present or future possession); *cf. Greenstein v. Singer*, 80 R.I. 141, 147, 96 A.2d 623 (1953) (proof of right to possession sufficient basis for conversion claim); *F.A. Thomas Machine Co. v. Voelker*, 23 R.I. 441, 448, 50 A. 838 (1901) (same). It therefore granted summary judgment in Old Colony's favor. We do not agree with the district court on this specific point, but we nonetheless conclude that its grant of summary judgment was legally correct.

We disagree with the specific legal ground upon which the district court rested the grant of summary judgment, because we believe that Harley and ITT might have proved at trial that they were entitled to possession of the 41 title certificates at the time of the claimed conversion. After all, their security agreements seem to include used motorcycles and their certificates as collateral; they seem to contain a promise by Clemence not to transfer, pledge, or encumber any of the collateral without the secured party's permission; they seem to make Clemence's violation of this promise a default; and they seem to give the secured party the right to possess the collateral upon default. The Uniform Commercial Code (as enacted in Rhode Island) says that, "*Unless otherwise agreed a secured party has on default the right to take possession of the collateral.*" R.I. Gen. Laws § 6A–9–503 (emphasis added). Commentators point out that, under the U.C.C., apart from certain limitations not here relevant, "default is 'whatever the security agreement says it is.'" 2 J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* § 27–2, at 563 (3d ed. 1988) (quoting 2 G. Gilmore, *Security Interests in Personal Property* § 43.3, at 1193 (1965)). The official commentary to U.C.C. § 9–306 says:

> In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article ..., continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him *or in an appropriate case maintain an action for conversion.*

R.I.Gen.Laws § 6A–9–306, comment 3 (emphasis added). And, case law supports the proposition that, when a debtor makes an unauthorized transfer of collateral, and when that transfer constitutes a default under the terms of a security agreement, the secured party obtains an immediate right to the collateral, permitting him to maintain an action for conversion. *See, e.g., United States v. Tugwell*, 779 F.2d 5, 7 (4th Cir.1985) (applying North Carolina law); *Taylor Rental Corp. v. J.I. Case Co.*, 749 F.2d 1526, 1529 (11th Cir.1985) (applying Florida law); *ITT Industrial Credit Co. v. H & K Machine Service Co.*, 525 F.Supp. 170, 171 (E.D.Mo.1981); *Ranier v. Gilford*, 688 S.W.2d 753, 755 (Ky.App. 1985); *Chemical Bank v. Miller Yacht Sales*, 173 N.J.Super. 90, 413 A.2d 619, 623, (N.J.Super.Ct. App.Div.1980); *Production Credit Ass'n of Madison v. Nowatzski*, 90

Wis.2d 344, 280 N.W.2d 118, 122–23 (1979); *see also* 2 J. White & R. Summers, *supra* p. 16, § 27–7, at 583–84, 584 n. 4; 1 F. Harper, F. James, Jr. & O. Gray, *The Law of Torts* § 2.31, at 220 (2d ed. 1986); Nickles, *Enforcing Article 9 Security Interests Against Subordinate Buyers of Collateral,* 50 Geo.Wash.L.Rev. 511, 516 n. 22 (1982); *cf. In re Ayers,* 25 B.R. 762, 775 (M.D.Tenn.1982) (secured party cannot maintain conversion action when the governing security agreement does not provide that an unauthorized transfer of collateral will constitute a default); *Mammoth Cave Production Credit Ass'n v. Oldham,* 569 S.W.2d 833, 838 (Tenn.Ct.App.1977) (secured party can only sue for conversion if it is determined that the disposition of the collateral was unauthorized); *Baldwin v. Marina City Properties,* 79 Cal.App.3d 393, 145 Cal.Rptr. 406, 416 (1978) (secured party could not maintain conversion action when it failed to allege that debtor defaulted and that the security agreement allowed them to take possession upon default).

■ Nonetheless, a "right to possession" is only *one* element of the tort of conversion. A plaintiff claiming conversion must also show that the defendant "so seriously interfere[d] with the right of another to control [the relevant property] that the [defendant] may justly be required to pay the other [its] full value." Restatement (Second) of Torts § 222A (1); *cf. Manufacturers Supply Co. v. Mullins,* 92 R.I. 191, 167 A.2d 755, 756–57 (1961) (wrongful taking or detention that is "merely technical" and results in "minimal," if any, damages does not support action for conversion). Given the undisputed facts in this case, we do not see how Harley and ITT could satisfy this requirement.

First, the transfer of a certificate could not, in and of itself, constitute a conversion. Clemence did not intend to transfer to Old Colony any greater interest than he had himself possessed in each certificate (an interest that is, of course, subject to Harley's and ITT's interests). Rhode Island law explicitly gives Clemence the power to transfer *that* interest to a third party. It says that a

debtor's right in collateral may be voluntarily … transferred (by way of sale, creation of a security interest …) *notwithstanding a provision in the security agreement prohibiting a transfer or making the transfer constitute a default.*

R.I.Gen.Laws § 6A–9–311 (emphasis added). The Restatement of Torts says that conversion, in the relevant circumstances (i.e., a conversion that would make a person liable to "a third person then entitled to the immediate possession of the chattel"), consists of receiving from another person "a proprietary interest in the chattel *which the other has not the power to transfer.*" Restatement (Second) of Torts § 229 (emphasis added). The fact that, in transferring, Clemence broke a promise does not, by itself, make the recipient a converter. *See* Nickles, *supra* at 526.

Second, Old Colony's *holding* of the certificates, even after the transfer (a transfer which put Clemence in "default"), does not constitute "conversion." We might be tempted to reach a contrary conclusion were we able to see the case as exemplifying *only* the following general facts: (1) senior lender lends debtor $100,000, taking a secured interest in 41 motorcycles with certificates; (2) junior lender lends debtor $50,000 more, taking possession of the motorcycle certificates to secure early repayment; (3) debtor must repay junior lender first in order to obtain the certificates; (4) debtor then defaults on senior lender. Perhaps, given these facts alone, one might argue for conversion on grounds of a *practical* interference with the senior lender's use of the collateral to secure repayment. Here, however, we must add to these facts certain others, namely (5) Harley and ITT expected to lose their secured interest in the motorcycles as Clemence sold them, gaining instead a secured interest in sale proceeds; (6) this is just what occurred in respect to the 41 motorcycles in question; and (7) Clemence owes Harley or ITT no money in respect to the particular motorcycles financed by them (among the 41 at issue), for Clemence repaid Harley and ITT's advances on the few new motorcycles among those 41. Given facts (5), (6), and

(7), we do not see how Old Colony's temporary possession of the 41 title certificates significantly interfered, as a practical matter, with any possessory right of ITT and Harley in those certificates.

Third, Old Colony's redelivery of the 41 certificates to Clemence rather than to Harley or to ITT does not constitute conversion. The redelivery to Clemence did not significantly interfere with Harley's or ITT's rights to possess the certificates (even though, because of the broken promise, they had such a right) because redelivery of the certificates to Clemence helped Clemence sell the used motorcycles. Harley and ITT, of course, *wanted* Clemence to sell the used motorcycles, and *expected* that he would do so. The sales created cash "proceeds" to which Harley and ITT could look for security. Under these circumstances redelivery to Clemence, by itself, was perfectly consistent with Harley and ITT maintaining a (so far unexercised) right to declare a default and repossess the collateral. As soon as Old Colony had reason to think that Harley or ITT would want the certificates (after Clemence declared bankruptcy), it delivered the (12 remaining) certificates to them.

For these reasons we cannot find an Old Colony interference with a Harley or ITT "right to control" the 41 title certificates that is "serious" enough to warrant imposing liability for "conversion" of those certificates.

### B.

### The Proceeds

Harley and ITT make a second conversion claim. They point out that Clemence sold the 41 (mostly used, but a few new) motorcycles that he had pledged to Old Colony, simultaneously repaying Old Colony its advances and redeeming the motorcycle title certificates. Old Colony knew, however, that Harley and ITT had a perfected security interest in the *"proceeds"* arising from the sale of *all* Clemence's inventory. In taking and keeping the "proceeds" from these 41 sales, Old Colony (say Harley and ITT) was "converting" money that belonged to Harley and ITT.

In our view, this claim should have survived Old Colony's motion for summary judgment. The Uniform Commercial Code makes clear that a secured party may obtain a secured interest in "proceeds." *See* R.I.Gen.Laws § 6A–9–306. The Code defines "proceeds" as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." R.I. Gen.Laws § 6A–9–306(1). It adds that a "security interest continues ... in any identifiable proceeds...." R.I.Gen.Laws § 6A–9–306(2). The law also indicates that a secured party may bring an action for conversion to recover collateral that has found its way into the hands of a third party whose interest is inferior. *See, e.g.,* R.I.Gen.Laws § 6A–9–306, comment 3; *Citizens National Bank of Whitley County v. Mid–States Development Co.,* 177 Ind.App. 548, 380 N.E.2d 1243, 1244 (1978); *Linn Cooperative Oil Co. v. Norwest Bank Marion, N.A.,* 444 N.W.2d 497, 498–99 (Iowa 1989); *Farmers and Merchants National Bank v. Sooner Cooperative, Inc.,* 766 P.2d 325, 329–30 (Okla.1988).

■ The arguments that Old Colony makes to the contrary do not demonstrate a right to *summary* judgment on the claim. First, Old Colony argues that Harley and ITT have no legal right to recover *any* sale "proceeds" because (as Harley and ITT concede) prior to payment, Clemence *commingled* the sale money with other money that he kept in a single Old Colony bank account. They point to one knowledgeable commentator, writing when the Code was new, who suggests that, once a seller commingles "proceeds" with other money, the proceeds are no longer "identifiable," and therefore no longer count as "identifiable proceeds" that the Code permits a secured party to recover. *See* 1 G. Gilmore, *Security Interests in Personal Property* § 27.4, at 736 (1965).

The problem with this argument, however, is that the courts have subsequently, with virtual unanimity, rejected Professor Gilmore's early view. They have held that, in certain special circumstances, a secured party may trace "identifiable proceeds"

through a commingled bank account and into the hands of a recipient who lacks the right to keep them. *See, e.g., Brown & Williamson Tobacco Corp. v. First National Bank,* 504 F.2d 998, 1002 (7th Cir. 1974); *Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville,* 358 F.Supp. 317, 323–24 (E.D.Mo.1973); *Domain Industries, Inc. v. First Security Bank & Trust Co.,* 230 N.W.2d 165, 168–69 (Iowa 1975); *Bank of Kansas v. Hutchinson Health Services,* 12 Kan.App.2d 87, 735 P.2d 256, 259–60 (Kan.Ct.App.1987); *Associates Discount Corp. v. Fidelity Union Trust Co.,* 111 N.J.Super. 353, 268 A.2d 330, 331–32 (N.J.Super.Ct. App.Div.1970); *Michigan National Bank v. Flowers Mobile Homes Sales, Inc.,* 26 N.C.App. 690, 217 S.E.2d 108, 111–12 (N.C.Ct.App.1975); *Anderson, Clayton & Co. v. First American Bank of Erick,* 614 P.2d 1091, 1094–95 (Okla.1980); *see also* Henning, *Article 9's Treatment of Commingled Cash Proceeds in Non–Insolvency Cases,* 35 Ark.L.Rev. 191, 194 n. 14 (1981) (citing cases). For example, when a debtor, aware that his bank account balance would prove inadequate to pay both a secured creditor (a finance company) and another debt he owed (to the bank), told the bank to set off quickly the money the debtor owed it, and when the bank (knowing all) did so after regular banking hours, the court held that the finance company could use common law tracing rules to trace "proceeds" (in which it held a secured interest) through the debtor's bank account and into the hands of the bank. *See Universal C.I.T. Credit Corp.,* 358 F.Supp. at 323–24.

Courts, in justifying the use of tracing, have pointed out that the Code itself says that they are to supplement its provisions with general "principles of law and equity." R.I.Gen.Laws § 6A–1–103; *see, e.g., Michigan National Bank,* 217 S.E.2d at 111. In deciding *when* to trace proceeds, they have distinguished between persons who take funds from a commingled account "in the ordinary course" of a debtor's business (where tracing and recovery are not appropriate), and recipients who have engaged in "fraudulent" or "collusive" or otherwise unfair behavior (where tracing

and recovery are appropriate)—a distinction the courts base upon an official U.C.C. Comment to § 9–306, Comment 2(c), which reads as follows:

> Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

R.I.Gen.Laws § 6A–9–306, comment 2(c).

In deciding *how* to trace "identifiable proceeds" through a commingled bank account, courts have used common law tracing rules. *See, e.g.,* cases cited pp. 23–24, *supra;* R. Hillman, J. McDonnell & S. Nickles, *Common Law and Equity Under the Uniform Commercial Code,* ¶ 22.05[2], at 22–57 to 22–60 (1985 & Supp.1989).

In sum, even though the courts have thus imposed rather strict limits as to *when* and *how* they will trace proceeds, the fact of commingling itself does not *automatically* bar recovery.

■ Second, Old Colony also argues here, as it argued in the district court, that a different subsection of U.C.C. § 9–306 limits Harley's and ITT's right to recover commingled proceeds in such a way as to preclude recovery in this case. That other subsection, § 9–306(4), says:

> In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:
>
> . . . .
>
> (d) In all cash and deposit accounts of the debtor, in which proceeds have been commingled with other funds, but the perfected security interest under this subdivision (d) is

. . . .

(ii) Limited to an amount not greater than the amount of any cash proceeds received by the debtor within (10) days before the institution of the insolvency proceedings [less certain sums already received]. . . .

R.I.Gen.Laws § 6A–9–306(4). The district court, noting that Clemence had gone through "insolvency proceedings," agreed with Old Colony that this provision applied and that it limited Harley's and ITT's rights to recover "proceeds" to the proceeds that Clemence had received in the 10–day period prior to June 10, 1985, when he declared bankruptcy (which amount, the court thought, in respect to the 41 motorcycles, was zero). We do not accept this argument, however, because we believe that this provision does not apply to Harley's and ITT's "proceeds" claim.

The provision, on its face, speaks of circumstances in which a debtor is undergoing "insolvency proceedings," in which event it limits a "secured party with a perfected interest in proceeds" to an "interest only in the *following* proceeds." R.I. Gen.Laws § 6A–9–306(4). Given the initial "insolvency proceeding" limitation, the provision, as most naturally read, would seem to apply only to assets in the hands of the debtor at the time of the insolvency (or later), or conceivably to assets that a trustee might bring back into the hands of the debtor (a matter we need not decide). The provision's objective is to provide rules for dividing the funds in a debtor's commingled bank account that are more definite, more readily usable, than the common law tracing rules that, say, a bankruptcy court might otherwise try to apply. *See, e.g.,* 2 J. White & R. Summers, *supra,* p. 16, § 25–10, at 463 ("In theory the secured creditor gives up the common law rights such as 'the lowest intermediate balance rule' in return for the claim he receives under [U.C.C. § 9–306(4)] subsection (d)."). What purpose would be served in applying the limitations of this provision to, say, briefly commingled "proceeds" that a third party knowingly (and outside the ordinary course of business) obtained from the debt-

or at a secured party's expense, many months *before* insolvency? The likely claimants are only the secured party and the third party (particularly where a bankruptcy trustee does not seek to bring the funds back into the estate). Why should the debtor's insolvency in such circumstances give the third party a better right to the money than it otherwise would have?

The district court feared that to hold that this "insolvency" provision applied only to commingled accounts in the debtor's possession (conceivably as augmented by a trustee's recovery actions) at the time of insolvency could produce different results depending upon whether a party brought his action in an "insolvency proceeding" or simply filed a common law tort action, say, in a state court. But that is not so. Irrespective of the *form* of a party's action, the court could find the party's right limited, or not limited, depending upon whether the party seeks recovery of money that remained in a commingled account when insolvency proceedings began, or that passed through a commingled account before insolvency.

For these reasons, we are not surprised to find that virtually all the courts that have considered the matter have concluded that the "insolvency" provision does not apply to a dispute between a secured party and a third party over money that was withdrawn from a commingled account *prior* to the institution of an insolvency proceeding. *See In re Intermountain Porta Storage, Inc.,* 74 B.R. 1011, 1015–16 (D.Colo.1987); *Citizens National Bank of Whitley County,* 380 N.E.2d at 1246; *Farmers and Merchants National Bank,* 766 P.2d 325 at 329, 329 n. 14; *Coachmen Industries, Inc. v. Security Trust & Savings Bank of Shenandoah,* 329 N.W.2d 648, 650 (Iowa 1983); *Tuloka Affiliates, Inc. v. Security State Bank,* 229 Kan. 544, 627 P.2d 816, 820 (1981); *see also* B. Clark, *The Law of Secured Transactions under the Uniform Commercial Code* § 10.03, at 10–35 n. 129 (2d ed. 1988). We believe Rhode Island would follow this authority.

Although we reject Old Colony's claims that the law prevents Harley and ITT from

trying to prove its conversion of *any* proceeds, we note the existence of other legal principles that severely limit the kinds of factual showing that might warrant recovery, and which will severely limit Harley's and ITT's ability to recover here. First, the courts, using comment 2(c) to U.C.C. § 9–306 to determine *when* they should trace proceeds through a commingled account, have limited recovery to circumstances where the behavior of the third party, if not fraudulent, has at least seemed highly unfair or improper. Comment 2(c) explicitly excludes any judicial efforts to trace (as "identifiable" secured "proceeds") money "paid out [of a commingled account] in the [*ordinary course* of] operation of the debtor's business." R.I. Gen.Laws § 6A–9–306, comment 2(c) (emphasis added). That comment goes on explicitly to include transfers that are "fraudulent," or "otherwise in collusion with the debtor to defraud the secured party," *id.;* and, courts have recognized instances falling *between* these two sets of circumstances where tracing is appropriate, *see, e.g., Linn Cooperative Oil Co.,* 444 N.W.2d at 499; *Farmers and Merchants National Bank,* 766 P.2d at 330. If, however, courts too readily impose liability upon those who receive funds from the debtor's ordinary bank account—if, for example, they define "ordinary course" of business too narrowly—then ordinary suppliers, sellers of gas, electricity, tables, chairs, etc., might find themselves called upon to return ordinary payments (from a commingled account) to a debtor's secured creditor, say a financer of inventory. Indeed, we can imagine good commercial reasons for *not* imposing, even upon sophisticated suppliers or secondary lenders, who are aware that inventory financers often take senior secured interests in "all inventory plus proceeds," the complicated burden of contacting these financers to secure permission to take payment from a dealer's ordinary commingled bank account. *See, e.g.,* Skilton, *The Secured Party's Rights in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Code,* 1977 S.Ill.U.L.J. 120, 156–57 (cautioning against overenthusiastic application of restitution principles to ordinary

secured transactions cases). These considerations indicate that "ordinary course" has a fairly broad meaning; and that a court should restrict the use of tracing rules to conduct that, in the commercial context, is rather clearly improper.

The record before us would not permit a finding that Old Colony acted unreasonably or improperly in simply lending Clemence money to finance his purchase of used motorcycles or asking Clemence to repay that money to Old Colony as he subsequently sold the old cycles. Consequently, the district court should not try to trace, through Clemence's commingled account, money that (1) arose from Clemence's sale of used motorcycles, (2) was repaid to redeem title certificates belonging to used motorcycles, and (3) represents repayment of advances that Clemence used to buy used motorcycles.

Second, courts, in deciding *how* to trace proceeds through commingled accounts, have used common law tracing rules. Those rules, at a minimum, prevent Harley and ITT from tracing into Old Colony's hands any "proceeds" that passed through Clemence's account at a time when, after withdrawal of funds to pay Old Colony, the account still contained enough money to pay any then current debt to Harley or ITT. The "lowest intermediate balance" rule, for example, would assume that any funds remaining in the account *after* an Old Colony payment withdrawal are the "proceeds" earmarked for Clemence's debts to Harley or ITT. Moreover, a later restoration of an account deficiency may stop a court from considering as "identifiable proceeds" money that was previously paid to Old Colony. (For explanation and application of these tracing rules, *see, e.g., Universal C.I.T. Credit Corp.,* 358 F.Supp. at 325–27; B. Clark, *supra* p. 29, ¶ 10.03, at 10–32 to 10–35; R. Hillman, J. McDonnell & S. Nickles, *supra* p. *26,* ¶ 22.05[2], at 22–57 to 22–62.)

Despite these limiting legal principles, however, we cannot now say that Harley and ITT are entitled to *nothing.* The record does not foreclose the possibility that some of the "proceeds" arose from

the sale of new (presumably "double financed") motorcycles, that Clemence paid this money into his commingled account, and that he subsequently transferred money to Old Colony from the account leaving the account insufficient to pay debts he then owed to Harley or ITT. We are not prepared to say now, without greater knowledge of the details surrounding such transfers, whether they did, or did not, amount to a transfer of "identifiable proceeds," out of the "ordinary course" of business, reflecting improper Old Colony behavior. We do believe that Harley and ITT have a right to prove the factual circumstances surrounding such transfers at trial.

For these reasons the judgment of the district court is

*Affirmed in part; vacated and remanded in part.*