Revised February 9, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-50500
_____


ITT COMMERCIAL FINANCE CORPORATION,

                    Plaintiff-Appellee,

v.

BANK OF THE WEST,

                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

January 20, 1999

Before KING, Chief Judge, and WISDOM and DAVIS, Circuit Judges.

KING, Chief Judge:

        Defendant-appellant Bank of the West appeals the judgment
of the district court granting plaintiff-appellee ITT Commercial
Finance Corporation's motion for summary judgment.  Bank of the
West challenges the district court's determinations that the
security interest of ITT Commercial Finance Corporation has
priority over Bank of the West's security interest, and that Bank
of the West is liable to ITT Commercial Finance Corporation for
conversion.  Although we agree with the district court's priority
determination, we disagree with its conclusion on conversion, and

we therefore reverse the district court's judgment and remand for further proceedings.


## I.   BACKGROUND

Defendant-appellant Bank of the West (BOW) and plaintiff-appellee ITT Commercial Finance Corporation (ITT) are both commercial lenders.  Over the course of several years, both BOW and ITT lent money to the same debtor, a fledgling microcomputer dealership that operated initially as a sole proprietorship run by Carlos Chacon and doing business under the trade name "Compucentro USA."  Two predecessors-in-interest to BOW, Coronado Bank and Texas National Bank, made loans to the sole proprietorship in August 1988 and February 1990, respectively. They filed financing statements in the office of the Secretary of State of the State of Texas (the Secretary of State) to perfect their security interests in a broad class of current and after-acquired property under the names "Carlos Chacon d/b/a Compucentro USA" and "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro USA."  BOW subsequently purchased these loans from the FDIC and now holds the security interests.

On November 26, 1990, Carlos Chacon incorporated the sole proprietorship under the name "Compu-Centro, USA, Inc."   On December 12, 1990, Chacon informed BOW of the incorporation using letterhead of the sole proprietorship bearing the name

2

"Compucentro USA."  The letter stated:  "Enclosed please find copies of our newly incorporated license.  As you finalize the paperwork on our loan you [m]ay want to reflect that we are incorporated."

On January 28, 1991, BOW filed a notice of assignment of the interest underlying Coronado Bank's 1988 filing with the Secretary of State, and, on March 11, 1991, BOW similarly filed a notice of assignment of the interest underlying Texas National Bank's 1990 filing.  These assignment notices did not reflect the debtor's recent incorporation.  Rather, they listed the debtor's name as "Chacon, Carlos d/b/a Compucentro, USA" and "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro USA," respectively.

BOW also independently extended secured financing to the new corporation, filing a new financing statement on January 18, 1991 covering a broad class of current and after-acquired property and specifying the name of the debtor as "Compucentro, USA, Inc." Notably, the filing left out the hyphen in the corporation's legal name.

On October 1, 1991, ITT agreed to extend a line of credit for inventory purchases to Compu-Centro, USA, Inc.  On October 14, 1991, ITT filed a financing statement covering a broad class of current and after-acquired property and specifying the name of the debtor as "Compu-Centro, USA, Inc."  In the course of conducting a credit review of the corporation, ITT learned, through a loan application and a credit report, that Compu-

3

Centro, USA, Inc. had existed before its November 1990 incorporation with a different name and business structure. ITT also possessed financial documents of the Chacons that listed a $68,000 liability to BOW for a loan. ITT did not investigate further, and, on October 18, 1991, ITT obtained an official search of the Secretary of State's records in the name "Compu-Centro, USA, Inc." ITT's filing was the sole filing reflected on the search report.

In the course of its business, Compu-Centro, USA, Inc. entered into a contract with the federal government to supply a medical center with computers. Neither ITT nor BOW provided Compu-Centro, USA, Inc. with funding to obtain these computers. Compu-Centro, USA, Inc. established an account at BOW in which it deposited the proceeds of the government contract. No other funds were deposited into this account. In 1993, Compu-Centro, USA, Inc. paid BOW $300,000 out of the $1.3 million received as proceeds of the government contract by a check drawn on the BOW account. The purpose of the payment was to satisfy, in part, the outstanding balance on the debt owed to BOW. BOW did not instruct Compu-Centro, USA, Inc. to make payment out of these proceeds and never offset or froze the account. At the time of the payment, Compu-Centro, USA, Inc. was in default on its obligation to ITT in the amount of $117,795.14.[1]

---

[1] Compu-Centro, USA, Inc. formally defaulted on its obligation to ITT on June 4, 1993.

On March 7, 1994, ITT filed this diversity action against BOW seeking a declaratory judgment regarding the priority of its security interest in the collateral of Compu-Centro, USA, Inc., and alleging that BOW had converted the proceeds of the government contract.  On cross-motions for summary judgment, the district court granted summary judgment in favor of ITT on the declaratory judgment claim, finding that ITT's lien had priority because BOW's earlier-filed financing statements were seriously misleading.  Thereafter, the case was transferred to a second district court judge, who granted ITT's motion for summary judgment on its conversion claim on the ground that BOW had not received the government contract proceeds from Compu-Centro, USA, Inc. in the ordinary course of business because the payment was in partial satisfaction of a money debt.  The district court entered final judgment in favor of ITT in the amount of $86,959.98 plus pre- and post-judgment interest.  BOW timely appealed.

## II.  STANDARD OF REVIEW

This court reviews the grant of summary judgment de novo, and applies the same standard used by the district court.  <u>See</u> <u>Norman v. Apache Corp.</u>, 19 F.3d 1017, 1021 (5th Cir. 1994). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

5

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All factual questions are viewed in the light most favorable to the nonmoving party. See Quest Exploration & Dev. Co. v. Transco Energy Co., 24 F.3d 738, 741 (5th Cir. 1994). In this diversity action, we must follow Texas law. See Cosden Oil & Chem. Co. v. Karl O. Helm Aktiengesellschaft, 736 F.2d 1064, 1069 (5th Cir. 1984).

## III. DISCUSSION

### A. Who Has Priority?

If BOW's filings perfected its security interest in the collateral of the debtor corporation Compu-Centro, USA, Inc., BOW enjoys first priority and consequently cannot be liable to ITT for conversion of the proceeds of the government contract. Although BOW's filings precede ITT's filing, ITT argues, and the district court held, that ITT has first priority with respect to the debtor corporation's collateral.

### 1. The District Court Opinion

In a thorough and careful opinion, the district court first addressed whether the 1988 and 1990 financing statements pertaining to Coronado Bank's and Texas National Bank's loans to the sole proprietorship sufficiently perfected BOW's security interest in the collateral at issue in this case--collateral

6

Compu-Centro, USA, Inc. indisputably acquired more than four months after its incorporation. According to the district court, because collateral acquired more than four months after Compu-Centro, USA, Inc.'s incorporation, by definition, had not been transferred from the sole proprietorship to the new corporation,[2] BOW could not rely upon the 1988 and 1990 financing statements to perfect its security interest in that collateral unless those filings were not seriously misleading with respect to the debtor's name after incorporation.[3] See TEX. BUS. & COM. CODE ANN. § 9.402(g) (West 1991).

A financing statement is not seriously misleading if "a reasonably prudent subsequent creditor would have discovered the prior security interest." Continental Credit Corp. v. Wolfe City Nat'l Bank, 823 S.W.2d 687, 689 (Tex. App.--Dallas 1991, no

---

[2] The Uniform Commercial Code (UCC), as adopted in Texas, provides: "A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer." TEX. BUS. & COM. CODE ANN. § 9.402(g) (West 1991).

[3] Section 9.402(g) further provides:

Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time.

TEX. BUS. & COM. CODE ANN. § 9.402(g). Therefore, the pre-incorporation financing statements would sufficiently perfect BOW's security interest in the after-acquired collateral of the new corporation provided they were not "seriously misleading."

7

writ).  The district court found that the pre-incorporation financing statements were seriously misleading as to the new name of the debtor, and therefore BOW was required to file a new financing statement after the debtor's incorporation to perfect its security interest in the collateral acquired more than four months after incorporation.  The district court "recognize[d] the obvious futility of discovering a financing statement [that] lists the debtor as an individual under the name 'Carlos Chacon' . . . in a search of a corporation under the name 'Compu-Centro, USA, Inc.'"  (internal quotation marks omitted).

The court similarly found that BOW's filings of the notices of assignment of the pre-incorporation security interests were seriously misleading because they too were filed under the pre-incorporation name of the debtor.  According to the court, the filings under "Carlos Chacon d/b/a Compucentro USA" and/or "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro USA" were seriously misleading because no reasonably prudent creditor searching for filings pertaining to a corporation named "Compu-Centro, USA, Inc." could be expected to find them.

The remaining question for the district court, therefore, was whether BOW's post-incorporation financing statement filed January 18, 1991 under "Compucentro, USA, Inc." effectively perfected its security interest in the collateral of the new

corporation.[4]  This required analysis of the Texas non-uniform

amendment which provides that:

> [f]iling under a trade name or assumed name alone shall not
> be sufficient to perfect a security interest unless the
> trade name or assumed name is so similar to the debtor's
> legal name that the trade name or assumed name filing would
> be discovered in a search of the filing officer's
> records . . . conducted in response to a request using the
> legal name of the debtor.

TEX. BUS. & COM. CODE ANN. § 9.402(g).  ITT argued that BOW's

January 1991 filing under the name "Compucentro, USA, Inc." was

in the corporation's trade name, and that, therefore, its January

1991 filing was invalid because of the Texas non-uniform

amendment.  There is no dispute that ITT's search under the

debtor's legal name, "Compu-Centro, USA, Inc.," did not discover

BOW's January 1991 filing.

BOW argued that it did not file under a trade name, but

rather misspelled the debtor's legal name, and that the Texas

non-uniform amendment is therefore inapplicable.  According to

BOW, the proper standard for evaluating BOW's filing is whether

the filing would be seriously misleading to a reasonably prudent

subsequent creditor.  See id. § 9.402(h).[5]

---

[4]  This filing will be referred to as the "January 1991
filing."

[5]  Section 9.402(h) of the Texas UCC provides that "[a]
financing statement substantially complying with the requirements
of this section is effective even though it contains minor errors
which are not seriously misleading."  TEX. BUS. & COM. CODE ANN. §
9.402(h).

The district court held that the Texas non-uniform amendment does not invalidate BOW's filing.  It reasoned that because "Compucentro USA," and not "Compucentro, USA, Inc.," was the debtor's trade name, it was clear from BOW's inclusion of the "Inc." in its filing designating "Compucentro, USA, Inc." as the name of the debtor that its intention was to file under the corporation's actual name, not its trade name.

We agree with the district court's analysis and conclude that the Texas non-uniform amendment does not apply.  That amendment applies only to trade name filings, and not to misspellings or typographical errors.  See Jerald M. Pomerantz, Trade Name Filings Under UCC Article 9:  Anatomy of a Nonuniform Amendment, 47 Consumer Fin. L.Q. Rep. 34, 36 (1993) (noting that the Texas non-uniform amendment "is not intended to deal with the problem of misspellings and typographical errors, which are covered by section 9.402(h) (the 'not seriously misleading' section)") (footnote omitted).  The appropriate analysis, therefore, is whether BOW's January 1991 filing under the name "Compucentro, USA, Inc." was seriously misleading such that it constituted an ineffective filing.  See TEX. BUS. & COM. CODE ANN. § 9.402(h).

The district court began its analysis of whether BOW's January 1991 filing was seriously misleading by describing the filing system utilized by the Secretary of State.  Before the advent of computerization, debtors were indexed alphabetically in

10

an index book that contained all of the financing statements on file.  A search in response to a request from a prospective creditor required an employee of the Secretary of State to look manually through the index book, much as someone would page through a telephone book.  A benefit of manual searching is that the searcher can retrieve and list not only those financing statements that exactly match the requested name, but also those statements that are similar enough to the requested name to fall in close proximity in the index.

Computerized searching, however, has become the norm.  As of April 1995, the district court found, thirty-seven states had adopted a computerized filing system, and four more were in the process of doing so--a response to the ever-increasing volume of financing statements flooding the filing offices.  The Secretary of State converted its records from a manual to a computerized filing system in 1972, although manual systems are still used in roughly 95% of the county clerks' offices in Texas.

Ironically, computerized searching can be less flexible than manual searching; because of the search parameters used by many computers, computerized searching often retrieves only names that exactly match the requested name.  The Secretary of State's computer software has some built-in mechanisms to retrieve filings that do not match exactly, but are similar to, the requested name.  For example, the system retrieves financing statements matching two or three words in the requested name.  It

does not, however, retrieve similar prefixes, suffixes, or alternative spellings of the debtor's name.  Most importantly for this case, when searching for a hyphenated word, the search program ignores the hyphen and leaves a space in its place, with the result that the system treats a hyphenated name as two separate words.  It searches under each of those separate words, but does not search under the combination of the two.

In reaching its decision, the district court focused on an important policy interest behind the Uniform Commercial Code (UCC)--providing notice to potential creditors of the security interests of earlier creditors.  In light of this policy interest and the reality of computerized searching, the district court concluded that a financing statement listing a misspelled name for the debtor that is not discovered in a search by the Secretary of State under the debtor's correct legal name does not comply with the requirements of § 9.402.  Applying this standard, the court held that because the name designated by BOW in its January 1991 filing, Compucentro, USA, Inc., was not discovered by a search using the corporation's actual legal name, Compu-Centro, USA, Inc., BOW's January 1991 filing was seriously misleading and did not perfect its security interest.  ITT therefore had first priority with respect to the corporation's collateral because all of BOW's filings were seriously misleading.

BOW argues on appeal that, in reaching the conclusion that BOW's filings were seriously misleading, the district court improperly applied a bright-line test rather than examining whether ITT acted as a reasonably prudent subsequent creditor.

## 2. Analysis

Because we agree with the district court's conclusion that the Texas non-uniform amendment does not invalidate BOW's January 1991 filing, we focus our attention on whether BOW's pre- and post-incorporation filings were seriously misleading.[6] Evaluating whether a filing is seriously misleading requires the court to apply the law to the individual facts of the case. See Borg-Warner Acceptance Corp. v. Fedders Fin. Corp. (In re Hammons), 614 F.2d 399, 402-03 (5th Cir. 1980) (stating that court must independently make legal conclusions on basis of facts of case); First Bank v. Eastern Livestock Co., 837 F. Supp. 792, 802, 803 (S.D. Miss. 1993) (evaluating financing statement on summary judgment motion and concluding that statement is not seriously misleading). Here, the material facts are not in dispute.

---

[6] These filings include the 1988 and 1990 Coronado Bank and Texas National Bank filings under the names "Carlos Chacon d/b/a Compucentro USA" and "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro USA," the 1991 notices of assignment of the 1988 and 1990 security interests under the names "Chacon, Carlos d/b/a Compucentro, USA" and "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro USA," and the January 1991 filing under the name "Compucentro, USA, Inc."

13

Our first task must be to define what constitutes a seriously misleading filing. Because "'[t]he purpose of the filing system is to give notice to creditors and other interested parties that a security interest exists in property of the debtor,'" <u>National Bank v. West Tex. Wholesale Supply Co. (In re McBee)</u>, 714 F.2d 1316, 1321 (5th Cir. 1983) (quoting <u>Brushwood v. Citizens Bank (In re Glasco, Inc.)</u>, 642 F.2d 793, 795 (5th Cir. Unit B Apr. 1981)), the relevant inquiry in analyzing the validity of a filing is whether the filing would suffice to put subsequent creditors on notice of the prior security interest. Therefore, as discussed above, a filing is legally sufficient only if a "reasonably prudent subsequent creditor" would have discovered the financing statement. <u>Continental Credit Corp.</u>, 823 S.W.2d at 689; <u>see</u> <u>In re McBee</u>, 714 F.2d at 1321. While the UCC does not require exactitude, "there can be less tolerance of errors in a debtor's name, since such errors may prevent a searcher from discovering the financing statement." <u>Transamerica Commercial Fin. Corp. v. General Elec. Capital Corp. (In re Wardcorp, Inc.)</u>, 133 B.R. 210, 215 (Bankr. S.D. Ind. 1990).

Financing statements containing minor errors or financing statements in names other than the debtor's legal name are not invalid, therefore, if they meet the objective of providing notice to future creditors, i.e., if they are not seriously misleading. Financing statements that are not likely to be located by reasonably prudent subsequent creditors, however,

14

cannot provide effective notice to them, undermining the purpose

of the UCC filing system.  Our inquiry, then, must be whether

BOW's pre- and post-incorporation filings were sufficient to

inform subsequent creditors of BOW's security interest in the

collateral that Compu-Centro, USA, Inc. acquired post-

incorporation.[7]

---

[7]  We note that revisions to Article Nine of the UCC are
contemplated.  A recent American Law Institute draft of a
proposed revision of Article Nine provides that, to be effective,
a financing statement must contain the proper legal name of the
debtor, and also that a filing that does not accurately list the
debtor's legal name is seriously misleading unless it is
discovered by a search under the debtor's legal name:

> (a)  A financing statement sufficiently provides the name of
> the debtor:
>
> > (1)  if the debtor is a registered organization, only
> > if the financing statement provides the name of the
> > debtor as shown on the public records of the debtor's
> > jurisdiction of organization;
>
> .  .  .  .
>
> (c)  A financing statement that provides only the debtor's
> trade name does not sufficiently provide the name of the
> debtor.

U.C.C. § 9.503 (Proposed Final Draft Apr. 15, 1998).

> (a) A financing statement substantially complying with the
> requirements of this part is effective even if it contains
> minor errors or omissions, unless the errors or omissions
> make the financing statement seriously misleading.
>
> (b) Except as otherwise provided in subsection (c), a
> financing statement that fails sufficiently to provide the
> name of the debtor in accordance with Section 9-503(a) is
> seriously misleading.
>
> (c)  If a search of the records of the filing office under
> the debtor's correct name, utilizing the filing office's

15

We first examine the 1988 and 1990 Coronado Bank and Texas National Bank filings. If these pre-incorporation filings did not become seriously misleading once the debtor incorporated, they would effectively perfect BOW's security interest in the collateral acquired by Compu-Centro, USA, Inc. more than four months after its incorporation.[8] We conclude that no reasonably prudent subsequent creditor searching for filings relating to a corporation named Compu-Centro, USA, Inc. could be expected to find filings under "Carlos Chacon d/b/a Compucentro USA" and "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro USA." The name used on these pre-incorporation filings (that of the owner of the sole proprietorship) and the name of the new corporation have nothing in common. No reasonably prudent subsequent

_____

standard search logic, if any, would disclose a financing statement that fails sufficiently to provide the name of the debtor in accordance with Section 9-503(a), the name provided does not make the financing statement seriously misleading.

Id. § 9.506.

Because we decide this case under the law currently in effect, we need not respond to the parties' arguments on the relationship between the current law and the proposed revision.

[8] Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time.

TEX. BUS. & COM. CODE ANN. § 9.402(g).

16

creditor searching for filings relating to the new corporation could be expected to find the pre-incorporation filings under the name Chacon.[9]  See Stevens v. Century Furniture Co. (In re CL Furniture Galleries, Inc.), No. 95 C 50103, 1995 WL 756853, at *5 (N.D. Ill. Dec. 20, 1995); 4 James J. White & Robert S. Summers, Uniform Commercial Code § 33-19, at 212-13, 214 (4th ed. 1995).[10] Therefore, the 1988 and 1990 Coronado Bank and Texas National Bank filings under the names "Carlos Chacon d/b/a Compucentro USA" and "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro USA" became seriously misleading upon incorporation and did not perfect BOW's security interest as to collateral acquired by the corporation more than four months afterwards because no reasonably prudent subsequent creditor would have found them when extending financing to a corporation named "Compu-Centro, USA, Inc."  Similarly, the 1991 notices of assignment of the 1988 and 1990 security interests under the names "Chacon, Carlos d/b/a

_____

[9]  While the pre-incorporation filings also listed the trade name of the sole proprietorship, as discussed infra, in Texas, no reasonably prudent subsequent creditor has a duty to search for filings under a debtor's trade name because of the Texas non-uniform amendment.  See TEX. BUS. & COM. CODE ANN. § 9.402(g).

[10]  Professors White and Summers provide support for this conclusion.  In their discussion of a hypothetical in which a bank lent money to a debtor named "Acme Co." that later changed its name to "Ajax Co.," they note that "[n]o reasonably diligent searcher looking under the new name of the debtor, Ajax Co., would be likely to find the financing statement showing Bank's interest in equipment and inventory of Ajax."  See White & Summers, supra, § 31-19, at 213.  They reach the same conclusion in the case where Acme Co. incorporates under the name Ajax Co. See id. at 214.

Compucentro, USA" and "Carlos R. Chacon and Lorena Chacon d/b/a Compucentro USA" were seriously misleading. Because the notices of assignment merely changed the name of the holder of the 1988 and 1990 security interests from Coronado Bank and Texas National Bank to BOW, but did not change the name of the debtor to reflect the debtor's newly-incorporated status, these notices of assignment would not have been found by a reasonably prudent subsequent creditor searching for filings pertaining to the new corporation Compu-Centro, USA, Inc., and thus did not perfect BOW's interest in Compu-Centro, USA, Inc.'s collateral.

The remaining question, then, is whether BOW's January 1991 filing was seriously misleading.[11] BOW's position is that outstanding factual questions preclude the resolution of this issue on a summary judgment motion, mandating a remand to the district court. When identifying which factual questions stand in the way of summary judgment, BOW points to facts known to ITT: that Chacon had operated under the trade name Compucentro, USA (without a hyphen), had recently incorporated the sole proprietorship, and had a loan from BOW.[12] BOW argues that this

---

[11] Section 9.402(h) of the Texas UCC provides that "[a] financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." TEX. BUS. & COM. CODE ANN. § 9.402(h).

[12] We note that the relevant inquiry is whether the law recognizes the facts relied on by BOW as relevant to whether BOW's filings were seriously misleading, not whether material facts are in dispute.

18

knowledge should have led ITT to discover BOW's security interest in Compu-Centro, USA, Inc.'s collateral.

As to ITT's knowledge of the debtor's trade name, a search under the former trade name of the sole proprietorship, "Compucentro, USA," would have led ITT to all of BOW's filings. However, after the enactment of the Texas non-uniform amendment, potential creditors need not search under a debtor's trade name, even if they have knowledge of that name, because in Texas a trade-name filing is insufficient to perfect a security interest unless a search under the debtor's legal name would reveal that trade-name filing. See TEX. BUS. & COM. CODE ANN. § 9.402(g); Pomerantz, supra, at 42.[13] Therefore, a reasonably prudent subsequent creditor in Texas would not conduct a search under the debtor's trade name. ITT's knowledge of Chacon's recent incorporation and personal indebtedness to BOW is similarly irrelevant in this case because even if BOW had conducted a

---

[13] The Texas non-uniform amendment was a legislative response to this court's decision In re McBee, 714 F.2d 1316 (5th Cir. 1983). See Pomerantz, supra, at 34-36. In In re McBee, we held that a filing under the debtor's trade name was not seriously misleading, even though the trade name and the debtor's actual name shared no words in common, because the facts of the case indicated that subsequent creditors should have known to search for the debtor's trade name. See 714 F.2d at 1324-25. This result placed upon subsequent creditors the burden of searching under trade names. See Pomerantz, supra, at 36. The purpose behind the Texas non-uniform amendment was to reallocate this burden and place upon the first creditor the duty to file carefully. See id. (noting that the Texas non-uniform amendment places "risk of loss on the party who is in the best position to guard against the loss," the first creditor, comporting with the notice filing system envisioned by UCC's drafters).

19

search in the name of the owner of the sole proprietorship, Chacon, it would not have found the January 1991 filing in the name "Compucentro, USA, Inc."

As discussed above, whether BOW's January 1991 filing was seriously misleading turns on whether the January 1991 filing was capable of providing notice to a reasonably prudent subsequent creditor of BOW's security interest. As a reasonably prudent subsequent creditor, ITT was required to conduct a search under the debtor's legal name. Here, that search did not discover BOW's January 1991 filing. At first blush, the difference between a filing under the name "Compucentro, USA, Inc." and a filing under the debtor's legal name "Compu-Centro, USA, Inc." appears so minor that it seems counterintuitive to conclude that a filing under the first name is ineffective. However, the law requires more than a comparison between the two names. BOW incorrectly listed the debtor's name on its January 1991 filing. Reasonably prudent subsequent creditors are not required to search under every conceivable misspelling of a debtor's name. See In re Wardcorp, 133 B.R. at 215 ("Any rule that would burden a searcher with guessing misspellings and misconfigurations of a legal name . . . would not provide creditors with the certainty that is essential in these commercial transactions."). Therefore, because the name Compucentro, USA, Inc. did not appear in connection with a search under the debtor's legal name, which would have placed the subsequent creditor on notice to inquire

20

further, see Paramount Int'l, Inc. v. First Midwest Bank, N.A. (In re Paramount Int'l, Inc.), 154 B.R. 712, 715 (Bankr. N.D. Ill. 1993), BOW's January 1991 filing was seriously misleading because no reasonably prudent subsequent creditor could be expected to find it. Although this outcome may appear harsh, it comports with the policies underlying the UCC. "[P]lacing on the filing creditor the burden of ascertaining and filing under a debtor's legal name is necessary to effectuate the UCC's policy of certainty and simplicity in these commercial transactions." In re Wardcorp, 133 B.R. at 216-17.[14]

We reject BOW's contention that, under the facts of this case, ITT had a duty to broaden its search beyond the debtor's legal name. BOW has presented no other facts on appeal from which to conclude that a reasonably prudent creditor lending money to Compu-Centro, USA, Inc. would have searched under any name other than the debtor's correct legal name. Therefore, the district court properly granted summary judgment in favor of ITT on the issue of priority.[15]

---

[14] We are not presented with a case where the Secretary of State's computer search logic is limited to retrieving names that exactly match the legal name of the debtor, and therefore need not decide whether a reasonably prudent creditor in that situation would have broadened its search.

[15] Because we conclude that a reasonably prudent subsequent creditor lending money to Compu-Centro, USA, Inc. would not, on this record, have searched under a name other than the debtor's legal name, we have no occasion to consider the validity of the district court's holding that reasonably prudent subsequent creditors in every situation need only search under the legal

**B.  Did BOW convert funds that rightfully belonged to ITT?**

Because ITT has first priority with respect to Compu-Centro, USA, Inc.'s collateral, we must decide whether BOW converted the proceeds of the government contract.  Under Texas law, conversion is the wrongful exercise of dominion and control over another's property in violation of the property owner's rights.  See Amarillo Nat'l Bank v. Komatsu Zenoah America, Inc., 991 F.2d 273, 274 (5th Cir. 1993); Tripp Village Joint Venture v. Mbank Lincoln Ctr., N.A., 774 S.W.2d 746, 750 (Tex. App.--Dallas 1989, writ denied).

ITT argues that its security interest in Compu-Centro, USA, Inc.'s collateral afforded it the right to the proceeds of the government contract.[16]  A properly perfected security interest extends to the identifiable cash proceeds of a sale of collateral subject to that security interest.  See TEX. BUS. & COM. CODE ANN. § 9.306(b) & (c)(2) (West 1991 & Supp. 1999).  The holder of the security interest is entitled to recover cash proceeds from unauthorized subsequent transferees.  See id. § 9.306 cmt. 3; Amarillo Nat'l Bank, 991 F.2d at 275.  In the instant case, the proceeds of the government contract were identifiable because they were paid into a special account at BOW into which no other

_____

name of the debtor.

[16]  Under § 9.503, ITT acquired a right of immediate possession of Compu-Centro, USA, Inc.'s collateral on June 4, 1993, the date on which Compu-Centro, USA, Inc. defaulted on its obligations to ITT.  See TEX. BUS. & COM. CODE ANN. § 9.503.

22

funds were deposited, and Compu-Centro, USA, Inc.'s payment to BOW was drawn on that account.  ITT never authorized Compu-Centro, USA, Inc.'s payment to BOW.

Comment 2(c) to § 9.306, however, suggests an exception to a senior creditor's right to recover transferred proceeds:

> Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course.  The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

TEX. BUS. & COM. CODE ANN. § 9.306 cmt. 2(c).  Thus, if Compu-Centro, USA, Inc. made payment to BOW "in ordinary course," BOW would take the proceeds free of ITT's security interest.

The definition of "ordinary course" is the problematic issue.  The district court utilized the definition of "buyer in ordinary course of business" found in § 1.201(9):

> "Buyer in ordinary course of business" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind . . . .  "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

23

Id. § 1.201(9) (emphasis added).[17]  Applying this definition in the context of Comment 2(c), the district court reasoned that because Compu-Centro, USA, Inc. paid BOW the government contract proceeds in partial satisfaction of a money debt, the payment was not in ordinary course for purposes of Comment 2(c).  The district court consequently found that Comment 2(c) did not allow BOW to accept the payment of the government contract proceeds free of ITT's superior security interest and therefore granted ITT's motion for summary judgment on its conversion claim.

BOW challenges the district court's conclusion that the definition of "ordinary course" for purposes of Comment 2(c) is coextensive with § 1.201(9)'s definition of "buyer in ordinary course of business."  The critical question is whether an element of § 1.201(9)'s definition of "buyer in ordinary course of business"--that the payment cannot be made in total or partial satisfaction of a money debt--is also an element of "ordinary course" for purposes of Comment 2(c), as the district court held.  BOW contends that it is not.  According to BOW, excluding payments made in total or partial satisfaction of a money debt from "ordinary course" for purposes of Comment 2(c) would render Comment 2(c) meaningless because every junior or unsecured

_____

[17]  The district court also relied upon Professors White and Summers for the proposition that, for purposes of Comment 2(c), junior creditors receiving payment of proceeds in ordinary course should be treated like buyers in the ordinary course under § 1.201(9).  See 4 James J. White & Robert S. Summers, Uniform Commercial Code § 33-19.5, at 75 (4th ed. Supp. 1998).

24

creditor who accepts a payment of proceeds from a debtor--including a vendor accepting a trade debt payment, a landlord accepting a rent payment, an employee accepting a payment of wages, an insurance agent accepting a policy premium payment, or a bank accepting a payment to reduce loan debt--does so in total or partial satisfaction of a money debt.  Under the district court's interpretation of Comment 2(c), therefore, every junior or unsecured creditor who accepts proceeds as payment will be liable for conversion, a result that would eviscerate Comment 2(c).  We find BOW's analysis persuasive.

ITT urges us to affirm the district court's conclusion that Compu-Centro, USA, Inc. paid BOW outside the ordinary course of its business for purposes of Comment 2(c) because the payment was in partial satisfaction of a money debt.  ITT cites cases holding that recipients of collateral transferred in total or partial satisfaction of a money debt fall outside the definition of "buyer in ordinary course of business."  See Amarillo Nat'l Bank v. Komatsu Zenoah America, Inc., 991 F.2d 273 (5th Cir. 1993); Permian Petroleum Co. v. Petroleos Mexicanos, 934 F.2d 635 (5th Cir. 1991); Central Appraisal Dist. v. Dixie-Rose Jewels, Inc., 894 S.W.2d 841 (Tex. App.--Eastland 1995, no writ); Chrysler Credit Corp. v. Malone, 502 S.W.2d 910 (Tex. App.--Fort Worth 1973, no writ).  These cases, however, do not speak to whether a payment in total or partial satisfaction of a money debt is excluded from "ordinary course" under Comment 2(c), nor do they

25

even mention the provision.  Rather, they pertain explicitly to creditors who receive collateral in satisfaction of money debts and therefore fail to qualify as a "[b]uyer in ordinary course of business" under § 1.201(9) (emphasis added).  See Amarillo Nat'l Bank, 991 F.2d at 276; Permian Petroleum Co., 934 F.2d at 648-49; Central Appraisal Dist., 894 S.W.2d at 842-43; Chrysler Credit Corp., 502 S.W.2d at 912-13.  Neither ITT nor the district court has cited any authority that would exclude from the definition of "ordinary course" in the context of Comment 2(c) the payment of proceeds in total or partial satisfaction of a money debt.

We agree with BOW that the district court's interpretation of Comment 2(c) cannot stand.[18]  We see no need to import § 1.201(9)'s exclusion of transfers in total or partial satisfaction of money debts into Comment 2(c) because that exclusion arises specifically in the context of defining "buying," a term that, while necessary for purposes of defining "buyer in ordinary course of business," is not applicable to Comment 2(c):

> Buying may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

---

[18]  Having found no Texas authority directly on point, we look to the law of other jurisdictions and interpret the law as we believe the Texas courts would.  See Orix Credit Alliance, Inc. v. Sovran Bank, N.A., 4 F.3d 1262, 1266 (4th Cir. 1993).

TEX. BUS. & COM. CODE ANN. § 1.201(9) (emphasis added). The district court improperly imported the part of the definition of "buyer" that excludes payments in satisfaction of money debts into the definition of "in ordinary course" for purposes of Comment 2(c), and therefore it applied the wrong standard in awarding summary judgment to ITT on its conversion claim.

The proper definition of "ordinary course" for purposes of Comment 2(c) remains to be determined. Looking to the remainder of § 1.201(9)'s definition of "buyer in ordinary course of business" (that is, without adding the requirements specific to the term "buyer"), we concur with our sister circuits that have found that Comment 2(c) protects payments made in the operation of the debtor's business absent improper conduct on the part of the recipient of the transferred proceeds. In Harley-Davidson Motor Co. v. Bank of New England--Old Colony, N.A., 897 F.2d 611 (1st Cir. 1990) (considering identical Rhode Island UCC provision), the First Circuit interpreted the phrase "ordinary course" in Comment 2(c) broadly, suggesting that only conduct "that, in the commercial context, is rather clearly improper" falls outside its scope. Id. at 622. The court cautioned against an overly-narrow reading lest "ordinary suppliers, sellers of gas, electricity, tables, chairs, etc., . . . find themselves called upon to return ordinary payments . . . to a debtor's secured creditor." Id. Under the court's interpretation, there are "good commercial reasons" for

27

"even . . . sophisticated suppliers or secondary lenders, who are aware that inventory financers often take senior secured interests in 'all inventory plus proceeds,'" to escape liability absent improper conduct. Id.

Building upon this precedent, the Seventh Circuit in J.I. Case Credit Corp. v. First Nat'l Bank, 991 F.2d 1272 (7th Cir. 1993) (interpreting identical Indiana UCC provision), concluded that "under Comment 2(c), a payment is within the ordinary course if it was made in the operation of the debtor's business and if the payee did not know and was not reckless about whether the payment violated a third party's security interest." Id. at 1279. In reaching this conclusion, the court interpreted the language of Comment 2(c), which in Indiana, as in Texas, provides that a secured party can recover proceeds "from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party." TEX. BUS. & COM. CODE ANN. § 9.306 cmt. 2(c); see J.I. Case Credit, 991 F.2d at 1276, 1277. According to the court, the use of the word "otherwise" in the above quotation implies that the definition of "out of ordinary course" must contain an element also found in the definitions of fraud and collusion. "If 'out of ordinary course' was not meant to involve common elements with collusion and fraud, the more natural phrasing would have been 'out of ordinary course or in collusion . . . .'" J.I. Case Credit, 991 F.2d at 1277. The court therefore decided that transfer "out of ordinary course"

28

requires knowledge on the part of the transferee that the transfer violates a superior security interest: Payment to a third party in the operation of the debtor's business is in the ordinary course "unless [the third party] knows the payment violates a superior secured interest in those funds." Id.; cf. Orix Credit Alliance, Inc. v. Sovran Bank, N.A., 4 F.3d 1262, 1267 (4th Cir. 1993) (holding that knowledge of prior security interest alone does not indicate that the transfer of proceeds occurred outside ordinary course under identical Virginia UCC provision). As an alternative to establishing knowledge, the court decided that recklessness about whether a payment violated a prior security interest also takes the payment out of the ordinary course. See J.I. Case Credit, 991 F.2d at 1278.

It is significant that the J.I. Case Credit court considered its interpretation of Comment 2(c) to be consistent with § 1.201(9)'s definition of "buyer in ordinary course of business." Section 1.201(9)'s definition protects those who buy "in good faith and without knowledge that the sale . . . is in violation of the ownership rights or security interest of a third party." TEX. BUS. & COM. CODE ANN. § 1.201(9). By analogy to this provision, the court reasoned that "ordinary course" for purposes of Comment 2(c) similarly requires good faith and lack of knowledge of the violation of a superior security interest. See J.I. Case Credit, 991 F.2d at 1277-78. Notably, although the court looked to § 1.201(9), it did not import that provision's

29

exclusion of payments made in total or partial satisfaction of money debts.

Professors White and Summers provide further support for this approach.  They agree with the reasoning of the courts that have found that junior creditors do not commit conversion merely by accepting payment with knowledge of a senior claim:

> [A]ny payment of proceeds paid in good faith and in the ordinary course to a junior creditor are free of the claim of the senior, and their taking does not constitute conversion by the junior creditor.  We would treat the junior creditors here like buyers in the ordinary course under 1-201(9).  A buyer can be in the ordinary course even though he knows of a security interest in the asset he is buying as long as he does not know that the transfer to him is in violation of that security interest.  By the same token we would argue that the junior should take free of the prior party's perfected security interest in proceeds even though he knows of the security interest, as long as he does not know of a term in the senior's agreement or an event in that relationship that could make the payment to him a violation of the debtor's promise to the senior creditor.

4 James J. White & Robert S. Summers, Uniform Commercial Code § 33-19.5, at 75 (4th ed. Supp. 1998).[19]

_____

[19]  Contrary to the interpretation of ITT and the district court, the suggestion in the above quotation that, for purposes of Comment 2(c), junior creditors should be treated like buyers in the ordinary course under § 1.201(9) does not support adopting § 1.201(9)'s requirement that the transfer cannot be made in total or partial satisfaction of a money debt.  Rather, as the text of the quotation makes clear, Professors White and Summers would treat a junior creditor under Comment 2(c) like a buyer in the ordinary course under § 1.201(9) only to the extent that both take free of a senior party's security interest, even with knowledge of that interest, so long as they lack knowledge "of a term in the senior's agreement or an event in that relationship that could make the payment . . . a violation of the debtor's promise to the senior creditor."  White & Summers, supra, § 33-19.5, at 75.

We agree with the reasoning of the courts and commentators discussed above, and we therefore hold that, for purposes of Comment 2(c), a payment is within the "ordinary course" if made in the operation of the debtor's business and if the recipient of the payment acted in good faith and without knowledge of or recklessness about whether the payment violated a third party's security interest. This result is consistent with the relevant portions of the definition of "buyer in ordinary course of business" under § 1.201(9), which requires good faith, a lack of knowledge of the violation of a superior security interest, and a purchase from a person in the business of selling goods of that kind. See TEX. BUS. & COM. CODE ANN. § 1.201(9).

In light of the above principles, the district court improperly granted summary judgment to ITT on its conversion claim. We therefore reverse its judgment and remand for application of the proper legal standard.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court, and remand for proceedings consistent with this opinion.

31